Filed 6/21/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S105908 |
| v. | ) | |
| | ) | |
| JOHN SAMUEL GHOBRIAL, | ) | |
| | ) | Orange County |
| Defendant and Appellant. | ) | Super. Ct. No. 98NF0906 |
| _____ | ) | |

A jury found defendant John Samuel Ghobrial guilty of the first degree murder of Juan Delgado, a 12-year-old boy, and found true the special circumstance that the murder was committed while defendant was engaged in the commission of a lewd and lascivious act on the child. (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17)(E), 288.) Following the penalty phase, the jury returned a death verdict and the trial court entered a judgment of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); Pen. Code, § 1239, subd. (b).) We affirm the judgment.

## I. FACTS

### A. Guilt Phase

On March 21, 1998, the partial remains of Juan Delgado were discovered near the address where defendant was then living. Defendant admitted that he killed Delgado, but denied that the murder was premeditated or deliberate. He

1

also denied that the murder was committed in the course of a lewd and lascivious act on the child.

### 1. *Prosecution case*

In March 1998, Delgado was a sixth grader at Washington Middle School in the City of La Habra. Defendant, who lived in a rented shed in La Habra, frequently was found panhandling in a commercial area of the city. Delgado and defendant were acquainted. A classmate, Armando Luna, recalled that he and Delgado saw defendant begging for food sometime in December 1997, and that Delgado had purchased a Snickers bar for defendant. On another occasion, in late February or early March 1998, Alfonso Solano saw Delgado and defendant "horsing around" outside a market and liquor store. Solano recognized defendant from defendant's earlier panhandling in the neighborhood; defendant is particularly distinctive because one of his arms had been amputated following an accident that had occurred many years before the murder. Solano did not know Delgado, but Delgado approached him as he exited the liquor store and whispered to him in Spanish, " 'Señor, sir,' . . . 'he is going to kill me.' " Solano then heard defendant tell Delgado in English, " 'I am going to kill you. I will kill you and eat your pee-pee.' "

Delgado was last seen on March 18, 1998. Another classmate, Josefina Gomez, saw Delgado walking with defendant behind her family's restaurant that afternoon. Defendant was holding Delgado by the hand. Gomez knew Delgado from school, and he greeted her as he walked towards an alleyway with defendant.

Early in the morning on Thursday, March 19, at about 12:30 a.m., defendant visited a Super Kmart in La Habra. He purchased a stockpot, cutting boards, knives, and pans. According to the cashier, Yvette Trejo, the entire transaction took about 15 minutes because defendant paid in small bills and

2

change, left the checkout line several times to seek out additional items, and asked her to ring up the items in separate transactions.

Later that same day, defendant went to a Home Depot in La Mirada, where a store employee, Alan Hlavnicka, helped him pick out bags of concrete and tools for mixing it. Hlavnicka estimated that he spent about 30 minutes speaking with defendant. Defendant asked Hlavnicka for a ride home, because he was purchasing several large, heavy items. Hlavnicka was unable to leave during his shift, but offered to drive defendant home later if he waited for Hlavnicka's lunch break. Defendant paid a cashier for the items and checked out at about 1:30 p.m.

Hlavnicka did not see defendant leave the store, but at approximately 2:45 p.m. that afternoon, Rene Hojnacki saw him pushing a shopping cart down Imperial Highway. Because it was a hot day, she initially offered him a ride. When she realized she could not fit his belongings in her car, she gave him some money for a cold drink and drove away. She told him she would return to give him a ride later, but she did not see him when she drove through the area later that afternoon.

Between 3:00 and 3:30 p.m. that afternoon, Steven Mead saw an older man drop defendant and his belongings off at the construction site in La Habra where Mead was working. The man asked Mead to give defendant a ride, and Mead eventually agreed. Mead moved concrete, wire, and a variety of tools that the older man had unloaded when dropping defendant off into his pickup truck. Mead then drove while defendant gave him directions. When Mead asked why defendant was transporting such large items without his own car, defendant demurred, telling Mead he had no means of transportation but needed money to feed four children. Mead observed that defendant did not speak English very well, was sweating profusely, and smelled like he was wearing cologne. Mead dropped

3

defendant off at his destination and helped defendant unload his purchases onto the curb.

At about 11:40 p.m. the following night, March 20, Gina Thompson was driving down Walnut Street in La Habra and saw someone using one arm to push a heavy shopping cart down the sidewalk. The cart contained two box-shaped objects, one of which had something sticking out of it. Between 11:30 p.m. and midnight that same night, Jose Madrigal was standing outside his home and saw defendant turn onto Highlander Avenue from Walnut Street pulling an empty shopping cart down the sidewalk. Madrigal recognized defendant because he had seen him panhandling outside a local supermarket.

The next morning, March 21, Lorenzo Estrada found a concrete cylinder dripping with blood on his front lawn. Estrada's home is approximately one block north and one block west of Madrigal's home. When the police picked up the cylinder later that day, the concrete had not yet set. Estrada did not recall seeing the cylinder when he returned home between 1:15 and 1:30 a.m. earlier that morning.

On the street outside Estrada's home and in his neighbors' yards, investigators found wire, wood, a red Target basket, a blue plastic jug, a thong sandal, and a shopping cart containing cement. Across the street, they found wet cement on the ground with what appeared to be a track running through it. Defendant lived in a rented shed behind the main house at that address. Another concrete cylinder was found a few blocks away on Walnut Street.

Later that day, law enforcement officers brought both concrete cylinders to the coroner's office and broke them apart. Each contained portions of Delgado's remains, some of which were wrapped in black plastic bags. Delgado's lower abdomen and pelvis were missing and not located for a full year, when a third

4

concrete cylinder was found behind an abandoned convalescent hospital less than two blocks east of the shed where defendant lived.

Defendant checked into the La Habra Motel the evening of March 21. He checked out between 7:00 and 8:00 a.m. the next day. He was arrested shortly thereafter.

Following defendant's arrest, law enforcement searched defendant's shed and found a number of tools, including a saw, a saw blade, scissors, a knife, a bloody cleaver, bolt cutters, a trowel, a capping tool, tin snips, latex gloves, and a black stockpot with cement inside, as well as packaging for some of these items. Defendant's fingerprints were found on several of the items, including the stockpot, the capping tool, and the packaging for the cleaver. There was wet cement on the floor, as well as blood on the carpet, the dresser, a wall, a quilt, and a blanket. The investigators also found some pornography, black trash bags, receipts for defendant's purchases at Super Kmart and Home Depot, a thong sandal that matched the one found in the street, some shoes and clothing, and a detention slip and paperwork with Delgado's name on it. Jorge Delgado, Juan's brother, identified the shoes and clothing as his brother's.

Dr. Aruna Singhania performed an autopsy on March 22. She testified that Delgado's head had been severed with irregular, jagged cuts, and the arms and legs had also been severed. Dr. Singhania observed trauma to the left eye that was consistent with choking or asphyxiation, but she did not identify a specific cause of death.

The following year, when a third concrete cylinder containing remains of Delgado's lower abdomen and pelvic section was found, Dr. Singhania performed another autopsy. She observed that the penis and scrotum had been severed and were missing, as were the internal genitalia. She did not observe any tearing or

5

trauma in the anus. The remains were covered in concrete and showed signs of decomposition. The victim's genitalia were never found.

At the time of the initial investigation, in 1998, law enforcement personnel were able to extract DNA from some of the blood found in the shed. Later analysis revealed that the blood in the shed was not defendant's and matched Delgado's DNA profile. The DNA specialist who performed the analysis testified that the statistical probability of a random match is less than one in one trillion. When the third cylinder was found a year later, investigators were unable to extract DNA samples for analysis from the pelvic region because of the decomposition of the tissue.

Aimee Yap, a forensic scientist with the Orange County Sheriff's Crime Laboratory, reviewed anal swabs taken from the pelvic remains for semen. Though a protein test did not reveal P30, a protein found in semen, Yap testified that that particular protein is unstable and can break down quickly. She further testified that she did identify sperm cells when she reviewed the swabs under a microscope. Yap identified the sperm cells based on the shape of intact sperm heads and through a staining process that revealed a particular distribution of nuclear material consistent with the structure of sperm cells. She acknowledged that the sperm tails were not visible, but explained that sperm tails are very fragile and break off easily, so the absence of tails did not affect her conclusion.

### 2. *Defense case*

The defense presented evidence that Delgado avoided spending time at home. For example, one evening in February 1998, Delgado visited his classmate Juan Duarte at home and asked if he could spend the night. Duarte's father told Delgado he could not stay, but offered to take him home, and Delgado refused the offer.

On the afternoon of March 17, Delgado told his classmate Armando Luna that he did not want to go home because he was afraid of his mother. That same afternoon, Delgado attended soccer practice at school and began walking home with his classmate and teammate Cipriano Flores. Delgado asked if he could come over, indicating that he did not want to go home because his mother would "hit him or spank him," and asked if he could spend the night. Delgado came over, ate dinner with Flores and his sisters, and fell asleep at Flores's apartment. The next morning, Flores's mother drove her children to school, but Delgado did not ride to school with them, nor did he attend school or soccer practice that day.

On his walk home from soccer practice that afternoon, Flores ran into Delgado, and Delgado asked if he could come over again. Delgado went home with Flores and urged Flores to tell his mother that Delgado's parents were in Los Angeles so he could sleep over. Flores's mother drove Delgado home that evening and watched him go inside. That was the last time Flores and his mother saw Delgado.

Several witnesses testified to the victim's and defendant's whereabouts in March 1998. Employees of Juan Pollo Chicken, a restaurant in La Habra, saw Delgado at the restaurant on March 16 and 18. Juan Duarte, Delgado's classmate, saw him at a local Pic-N-Save store with defendant a couple of weeks before Delgado's death. Defendant was at that same Pic-N-Save on March 19, between 5:00 and 5:30 p.m., and handed a religious flyer to an employee.

Elizabeth Thompson, a forensic scientist with the Orange County Sheriff's Crime Laboratory, was present for Dr. Singhania's autopsy of Delgado's pelvic region in March 1999. Thompson testified that Dr. Singhania had observed during the autopsy that the victim's body had not been dismembered until he was already dead.

David Posey, a private forensic pathologist, reviewed slides of the anal swabs prepared by Aimee Yap, and reviewed Yap's pictures of the swabs. He described his approach to identifying sperm, which requires the presence of both a neck and a tail, and testified that the Federal Bureau of Investigation follows the same protocol. Because the cells found in the swabs did not have necks or tails, he did not identify sperm in the samples.

### 3. Prosecution's rebuttal evidence

Edwin Jones, a forensic scientist with the Ventura Sheriff's Crime Laboratory, also reviewed the slides that Yap had prepared. Jones identified the same sperm cells that Yap did, as well as several others, based on the cells' shape and differential staining. He criticized the methodology that Posey had used to identify sperm cells and testified that the FBI's protocol, which requires the presence of both a sperm head and tail to identify a sperm cell, does not reflect modern science.

## B. Penalty Phase

### 1. Prosecution's case in aggravation

Defendant's cousin, M.F., testified that defendant sexually molested him and stabbed him when M.F. was six years old. The incident took place at M.F.'s older sister's wedding in Egypt in 1993. M.F. testified that defendant asked him to go get some "sweet[s]" with him, and when they had walked away from the house, defendant told M.F. to take his clothes off. When M.F. refused, defendant tied him up. Defendant then attempted to rape him, stepped on his head, stabbed him a number of times and punched him, causing permanent injury to his jaw.

The prosecution presented testimony from Delgado's parents describing the negative effect the loss of their son had on them and on their other children.

8

## 2. *Defendant's case in mitigation*

### i. *Testimony from defendant's family*

Defendant was born and raised in Egypt and moved to the United States as an adult. Defendant's father, Samwiael Ghobrial, described his son as a fairly isolated child and an unsuccessful student. He testified that their family is Christian, and in Egypt, Christian children are routinely attacked by Muslim children in schools. On one occasion in elementary school, another student stabbed defendant with a geometric compass.

Samwiael[1] testified that defendant sustained head injuries when he was a young child. Samwiael also described his son's emotional problems: Defendant would regularly mirror Samwiael's emotions, smiling when Samwiael smiled, and crying when Samwiael cried, and defendant was constantly shaking or shivering. When defendant was in junior high, defendant's mother told him there was ancient treasure buried in their area. For a number of years, defendant was fixated on the possibility of finding gold, constantly digging for it in the family's garage, even after he was told the story was not true.

Defendant would later serve in the Egyptian army, and Samwiael testified that defendant's behavior turned more bizarre when he returned from his army service. For example, defendant would defecate on the roof of the house or inside the garage, and he would regularly sit and stare. He continued digging for gold often and would become extremely angry when he did not find any. He would also sell things from around the house. Samwiael testified that he punished defendant for this behavior by tying up defendant and beating him with chains. Samwiael had also severely beaten defendant on an earlier occasion, when defendant intervened to prevent him from physically assaulting his wife, defendant's mother.

---

[1] To avoid confusion, we refer to defendant's father by his first name.

Samwiael described the family's unsuccessful efforts to treat defendant's mental illness both before and after his time in the army. Defendant received electric shock therapy and medications. On the day after defendant took his medicine, he would drool and foam at the mouth. Samwiael testified that he had also received psychiatric treatment in Egypt.

Defendant's younger sister, Janet Salama, described her close relationship with her brother when she was a child and he still lived in Egypt. He would take her to Sunday school and help her with her lessons. She testified that he was her best friend, helped her when she felt sad, and felt like a father to her. She said her feelings had not changed since he had gone to jail.

### ii. Testimony from members of the community

Several other witnesses were familiar with defendant from his panhandling and loitering in La Habra in the years since he moved to the United States. They described his unusual behavior: While panhandling, he had a vacant stare, "like he was out of it," one woman testified, and when he handed out flyers, he would not make conversation or smile. One woman testified that the way defendant looked at her while panhandling made her uncomfortable.

Father Athanasius Ragheb, an Egyptian native who is a priest in Santa Ana, described his interactions with defendant. Defendant had attended Father Ragheb's church and went to confession with him. Several years before the trial, defendant had lived in housing at the church for about six months. Father Ragheb described defendant as a kind person who would often give away the food and money that Father Ragheb gave him. Father Ragheb testified that members of the church generally liked defendant and were sympathetic towards him. Father Ragheb described defendant as "not very smart" and testified, "[M]y gut feeling, that [*sic*] he was not psychologically . . . sane."

10

*iii. Testimony from psychiatrists and other mental health professionals*

The vast majority of testimony in the penalty phase came from a number of mental health professionals who treated defendant in the Orange County jail during the three years before his trial began. Defendant exhibited a number of psychotic behaviors and regularly suffered from hallucinations. As a result, he was treated with a variety of drugs and was occasionally housed in the jail's acute mental health unit. Rachelle Gardea, a nurse and case manager at the jail, explained that acute mental health housing is generally reserved for "somebody who is suicidal, actively psychotic, for some reason unable to function in regular housing . . . ."

Eight psychiatrists examined defendant in the three years before defendant's trial and provided their observations and conclusions. Dr. Steven Johnson, the psychiatric director at the Orange County jail during this time period, explained that a psychiatrist was usually responsible for seeing patients in a particular housing section for a two-month rotation. Defendant was therefore treated by different psychiatrists and nurse practitioners over time, and this variability was compounded when he moved in and out of mental health housing. Many members of defendant's treatment team—which included the psychiatrists, psychologists, and nurse practitioners treating him at a particular time, as well as case managers and the service chief—testified that they had trouble communicating with defendant due to the language barrier; Dr. Johnson attributed this in part to the limited availability of Arabic translators in the jail.

Dr. Johnson treated defendant between April 1998 and August 2001. In September 1998, Dr. Johnson assessed defendant as psychotic and suicidal, and ordered suicide precautions. In December 1998, Dr. Johnson ordered suicide precautions again after defendant had engaged in genital mutilation by tying a

11

string around his penis. In January 1999, Dr. Johnson was able to examine defendant with an Arabic translator, and defendant reported auditory hallucinations; Dr. Johnson maintained his assessment that defendant was psychotic. In May 1999, Dr. Johnson examined defendant without a translator after he had moved to the acute mental health housing area, and observed that defendant's behavior was consistent with psychosis, but might be the result of malingering.

Defendant's treatment team met occasionally to discuss his diagnosis and treatment needs. In August 1999, after defendant's auditory hallucinations had persisted for several months, the team updated defendant's diagnosis from an unspecified psychotic disorder to schizo-affective disorder. Around that time, Dr. Johnson and Dr. Girgis, another psychiatrist at the jail, discussed the possibility of prescribing defendant Clozaril. Though defendant was not ultimately prescribed Clozaril, Dr. Johnson testified that he would not even consider prescribing it unless he considered a patient to be "seriously mentally ill." Dr. Johnson modified defendant's prescriptions several times between January and May 2001. In February 2001, Dr. Johnson noted that defendant's condition was improving, and in August, Dr. Johnson noted that defendant denied hallucinations or suicidal ideation.

In May 1998, Dr. John Woo observed defendant responding to internal stimuli and exhibiting inappropriate affect and bizarre behaviors, and diagnosed defendant with having a "psychosis not otherwise specified." In January 1999, Dr. Woo concluded that defendant was experiencing auditory hallucinations.

In June 1999, Dr. Jasminka Depovic saw defendant in the acute mental health housing unit, where he had been transferred after having defecated and urinated on himself and was not eating. In April and May 2000, she saw defendant after he had defecated in the shower and tied a string around his penis in

12

what he described as an effort to "stop breathing." She saw him again in July 2001, when he was responding to internal stimuli, was very disheveled, and exhibited poor insight and judgment, and she concluded that it was "questionable" if he was dangerous to himself or others. Dr. Depovic agreed with her colleagues' diagnosis of schizo-affective disorder.

Dr. Raafat Girgis, a forensic psychiatrist, examined defendant in August 1999. Dr. Girgis, who is a native of Egypt, spoke to defendant in Arabic. Defendant told Dr. Girgis that he was hearing voices that commanded him to cut his genitalia and to hurt others. Dr. Girgis concluded that defendant had poor insight into the nature of his mental illness and that he suffered from schizophrenia, "disorganized type," which means that there is a disorganization of the thought process. Defendant also told Dr. Girgis that his father had a history of mental illness.

Dr. Teresa Farjalla saw defendant on a number of occasions between March 1998 and September 2001. In August 1998, she did not observe any signs of defendant being "overly psychotic." She was aware of defendant's history of self-harming behavior by tying a string around his penis, however, and noted that it occurred again in December 1998. During that same period of time, defendant was not showering or changing his clothes, and Dr. Farjalla and her colleagues concluded that he was suffering from depression. In May 1999, she observed that he was hallucinating and talking to himself and had been urinating in his cell. In June and September 2001, Dr. Farjalla observed that defendant's insight and judgment were poor, meaning that he did not appreciate the nature of his illness. Dr. Farjalla agreed with her colleagues' diagnosis of defendant with schizo-affective disorder, and she explained that the severity of schizophrenia symptoms can fluctuate with time and with stress.

13

Dr. Jose Flores-Lopez worked as a psychiatrist at the Orange County jail until early 2000.  In April 1998, he observed that defendant was experiencing auditory hallucinations and had refused his medications, but he did not see any evidence of acute mental illness.  In August of that same year, he observed that defendant was paranoid and delusional and responding to internal stimuli, and he concluded that defendant was likely suffering from schizophrenia or some type of psychosis.  In December 1998, Dr. Flores-Lopez noted that defendant had been mutilating his genitals; the doctor determined that defendant suffered from some form of psychosis.  In July 1999, Dr. Flores-Lopez observed that defendant was taking the maximum appropriate doses for certain medications taken to treat schizo-affective disorder, but was still experiencing symptoms, so the benefits of those medications were probably at a "plateau."  As a result, he concluded that defendant's condition was chronic and stable.  He continued to conclude that defendant was likely suffering from psychosis or schizo-affective disorder, and maintained this opinion until he left the jail in early 2000.  Dr. Flores-Lopez also testified that in April 1999, he had noted that he wanted defendant to be assessed for competency because he "wasn't sure that [defendant] was competent."

At various points in time, Dr. Flores-Lopez considered whether defendant was being intentionally manipulative or malingering.  For example, in December 1998, he observed defendant talking to himself; staff members told him that defendant did so only when Dr. Flores-Lopez was present, though other inmates indicated that defendant also talked to himself when no staff members were present.  In April 1999, Dr. Flores-Lopez noted that defendant reported auditory hallucinations, but he appeared to respond to internal stimuli only when he was being observed, and other staff had reported to Dr. Flores-Lopez that defendant's behavior was "within normal limits."  He explained that mental illness can be exacerbated by stress, including the stress caused by a transfer out of mental health

14

housing to general housing, and that the stresses of jail can affect patients differently. He also explained that inmates sometimes exaggerate the symptoms of their mental illness to ensure they can stay in mental health housing, which has a limited capacity. Other psychiatrists who testified, including Dr. Johnson, had also considered the possibility that defendant was malingering.

On cross-examination, Dr. Flores-Lopez explained that the language barrier made it difficult to assess whether defendant was malingering; according to Dr. Flores-Lopez, it was "almost impossible to take apart the subtleties that you would be able to do with an English speaking patient." He testified that he could not rule out malingering without psychological testing. Dr. Flores-Lopez noted, however, that he had observed a number of symptoms in defendant over time that were consistent with schizophrenia and would be unlikely in an individual who is malingering because only someone with medical knowledge would be aware that these symptoms are associated with schizophrenia.

In July 2001, Dr. Ebtesam Khaled, a native speaker of Egyptian Arabic, observed that defendant was experiencing hallucinations, had memory problems, was "very guarded and suspicious," and had poor insight and judgment. Defendant exhibited suicidal tendencies, so Dr. Khaled ordered "suicidal precaution observation." Dr. Khaled discontinued that observation a short time later, after defendant denied feeling suicidal four days in a row.

In addition to the psychiatrists' testimony, six nurses, two case managers, a social worker, and a mental health specialist testified as to their observations of defendant during the three years he spent at the Orange County jail before trial.

Virginia Sollars, a nurse at the jail, observed in March 1998 that defendant's mood and affect were inappropriate. In May 1998, Linda Price, another nurse, observed defendant talking to himself and noted that he was responding to internal stimuli. That same month, Margaret Wiggenhorn, a mental

15

health specialist at the jail, met with defendant; defendant denied suicidal ideation and hallucinations, and told her, "I am not crazy." Later that month, Wiggenhorn observed that he may have been responding to internal stimuli, and he admitted to auditory hallucinations.

Jill Savage, a case manager for the Orange County Health Care Agency, testified that in June 1998, she learned that defendant was refusing his antipsychotic medication; defendant told her he was "all better" and no longer hearing voices. The next month, defendant told Savage there were four Black men in his cell; he took Savage to his empty cell and pointed inside, insisting they were there. In September 1998, he reported that he was hearing voices, including his family members', in his cell. Later that month, defendant had tied a string around his penis; he told her he did not remember tying it on, and found it like that when he woke up. In December 1998, Savage observed further mutilation of defendant's genitals.

Kristen Whitmore, a nurse practitioner working in mental health at the jail, observed in July 1998 that defendant was sexually preoccupied and had been asking nurses to apply antifungal cream on his groin. In August 1998, Kay Cantrell, another nurse at the jail, observed defendant after he had been seen smearing food in his cell and shaking; she noted that he was mute, his eyes were making "slightly jerking movement," he was "moving lips without speaking," and he appeared to be "responding to internal stimuli."

In January 1999, defendant told Nabeel Bechara, another nurse at the jail, that he was hearing voices. Leonard Luna, a clinical social worker with the jail, observed defendant talking to himself in the mirror in February and March 1999, and in April, defendant told Luna that he was hearing voices. Luna observed defendant talking to himself again in May and June 1999, and noted in June that defendant had been urinating on the floor of his cell. In September 1999, Luna

16

saw defendant again and noted that he was unkempt, and, in both September and December, Luna observed defendant talking to himself. In January 2000, Luna noted that defendant's mood was improved. In May, Luna again observed defendant unkempt and talking to himself.

Rachelle Gardea, a nurse who served as a case manager for mental health patients in the jail's acute mental health housing unit, observed defendant in July 2000. She noted in defendant's file that he should be evaluated for an involuntary psychiatric hold in advance of release from the facility to avoid potential danger to himself or others. In June 2001, Gardea noted that defendant had been pulling out his own hair and that he had fallen while walking through the jail; defendant could not explain either behavior.

April Barrio, a nurse practitioner in psychiatry at the jail, observed defendant in October 1999; she noted that he had a bizarre or inappropriate affect. She observed him again in November 1999 and noted that he was disheveled, his cell was a mess, and he was moving his lips as if talking to someone, even though he was alone. She concluded that he was experiencing hallucinations and his psychosis was slightly increased.

In April 2000, Barrio noted that defendant's condition appeared chronic but stable and he was responding to his medications. In early July 2000, she observed that defendant continued to experience auditory hallucinations, his behavior was more appropriate and responsive, he was communicating more in English, and his condition was slightly improved from her last visit with him. Approximately two weeks later, defendant had shaved his eyebrows, and he admitted to Barrio that he did so because voices told him to; he also complained of an increase in auditory hallucinations. In August 2000, defendant told Barrio that voices had told him to put butter and coffee on his face. Barrio observed defendant in his cell, which was "trashed," with his clothes and a small piece of cloth on the floor; he told Barrio

17

that he had been "tying his penis."  Later that month, she noted that defendant remained psychotic and should be subject to a hold for psychiatric evaluation before possible release from jail.[2]

In September 2000, Barrio observed defendant moving his lips as if chanting or talking to someone while he was alone in his cell.  When she asked if he was hearing voices, he replied, "voices, food, John, eat."  In October 2000, defendant told her he was experiencing auditory, visual, and tactile hallucinations. In November 2000, defendant reported a tactile hallucination of a woman touching him, as well as voices telling him, "go, John; eat, John; John bad."  In December 2000, he complained to Barrio of auditory hallucinations telling him to scratch himself and pull his hair and pull off his toenails; Barrio noticed his hair was thinning.  Barrio, however, observed that defendant's auditory hallucinations decreased and his condition improved after she adjusted his medications later that month.

Saundra King, a case manager at the jail, observed in May 2000 that defendant was depressed and his affect was flat.  In July 2000, she noticed abrasions on defendant's face; he told her that voices had commanded him to pick at his face and to rub butter and coffee grounds into it.  In September 2000, he reported hallucinations, and in October 2000, defendant was hypertalkative and rambling.  In both January and March 2001, King observed that defendant had been pulling out his hair.  In September 2001, King met with defendant after he

---

[2]      Barrio testified that she had felt "he definitely fits one of the 5150 criteria." This was presumably a reference to a 72-hour involuntary hold for "assessment, evaluation, and crisis intervention" under Welfare and Institutions Code section 5150.  Such a hold is permitted when a professional has probable cause to believe that the person, "as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled."  (Welf. & Inst. Code, § 5150, subd. (a).)

18

returned from court, and she noted that he was alert and coherent, and his mood was pleasant and his affect appropriate.

Dr. Ari Kalechstein, a private psychologist with a specialty in neuropsychology, was hired as an expert witness by the defense. In January and February 2001, he performed a series of neuropsychological tests designed to measure defendant's attention span and his ability to engage in complex tasks. Defendant's performance was below average on all tests, and impaired on many of them. Dr. Kalechstein performed additional tests to determine whether defendant was malingering, and concluded that he was not. Based on defendant's performance on all of these tests, Dr. Kalechstein concluded that defendant suffered from some frontal lobe impairment, which is not uncommon in individuals suffering from a psychotic disorder.

## II. DISCUSSION

### A. Trial Court's Failure to Hold a Hearing to Determine Defendant's Competence to Stand Trial

Defendant argues that substantial evidence was introduced at the penalty phase that raised a doubt as to his competence to stand trial. He argues the trial court therefore should have suspended proceedings and held a competency hearing, and the court's failure to do so violated his due process and other federal constitutional rights, as well as his statutory rights under Penal Code section 1367. We conclude that the trial court did not abuse its discretion by failing to declare a doubt as to defendant's competence based on the penalty phase evidence adduced by his counsel.

The principles that guide the inquiry are well established. "The United States Supreme Court has 'repeatedly and consistently recognized that "the criminal trial of an incompetent defendant violates due process." ' " (*People v. Lightsey* (2012) 54 Cal.4th 668, 690.) To safeguard a defendant's right to due

19

process and a fair trial, the trial court has an obligation to hold a hearing to inquire into the defendant's competence when there is a bona fide doubt as to the defendant's competence to stand trial, and failure to do so is reversible error. (*Pate v. Robinson* (1966) 383 U.S. 375, 385; *People v. Pennington* (1967) 66 Cal.2d 508, 518.)

The test of whether a defendant is competent to stand trial is whether he " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' " (*Dusky v. United States* (1960) 362 U.S. 402, 402.) This standard is codified in Penal Code section 1367, which precludes trial of a defendant who "as a result of mental disorder or developmental disability . . . is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (Pen. Code, § 1367, subd. (a).)

"Both federal due process and state law require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. ([Pen. Code,] § 1368; *Drope v. Missouri* [(1975)] 420 U.S. [162,] 181.)" (*People v. Rogers* (2006) 39 Cal.4th 826, 847 (*Rogers*).) " '[A]bsent a showing of "incompetence" that is "substantial" as a matter of law, the trial judge's decision not to order a competency hearing is entitled to great deference, because the trial court is in the best position to observe the defendant during trial.' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 465 (*Sattiewhite*).) "Whether to order a present sanity hearing is for the discretion of the trial judge, and only where a doubt as to sanity may be said to appear as a matter of law or where there is an abuse of

20

discretion may the trial judge's determination be disturbed on appeal." (*People v. Pennington*, *supra*, 66 Cal.2d at p. 518.)

On appeal, our task is to examine "the inferences that were to be drawn from the undisputed evidence" and to ask "whether, in light of what was then known, the failure to make further inquiry into petitioner's competence to stand trial, denied him a fair trial." (*Drope v. Missouri*, *supra*, 420 U.S. at pp. 174–175 (*Drope*).) The focus of our inquiry is the evidence that "was in fact part of the record presented or otherwise made available to the trial court." (*People v. Mickel* (2016) 2 Cal.5th 181, 197 (*Mickel*).) "We do not require a trial court to evaluate a defendant's competence based on evidence not before it at the time of its decision." (*Ibid.*)

"[I]f a qualified mental health expert who has examined the defendant ' "states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel," ' that is substantial evidence of incompetence." (*People v. Lewis* (2008) 43 Cal.4th 415, 525 (*Lewis*).) But absent such testimony, no single factor is necessary to establish sufficient doubt of a defendant's competence as to require a hearing. Rather, a court must consider the "aggregate of th[e] indicia" of the defendant's competence. (*Drope*, *supra*, 420 U.S. at p. 180.) "Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations. [Citations.]" (*Rogers*, *supra*, 39 Cal.4th at p. 847.) But the evidence must bear on the defendant's competency to stand trial, rather than simply establish the existence of a mental illness that could conceivably affect his ability to understand the proceedings or assist counsel. (*Ibid.*) "[M]ore is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] or

21

statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense [citation]." (*People v. Laudermilk* (1967) 67 Cal.2d 272, 285; accord, *Mickel*, *supra*, 2 Cal.5th at p. 202.)

In this case, no issue was raised about defendant's competence at any point during the trial, and both sides appear to agree that the court was not privy to any information during the guilt phase that would have raised a doubt about defendant's competence. The record contains no indication that defendant exhibited concerning behavior during either phase of trial. During the penalty phase, however, the defense introduced considerable evidence of defendant's mental illness as part of its case in mitigation. This evidence included the testimony of numerous mental health professionals who had examined and treated defendant at the Orange County jail during the three years he awaited trial, as well as the testimony of family members and members of the community who described defendant's history of mental illness and associated symptoms. Defendant now argues that this evidence required the trial court to suspend proceedings on its own motion and to hold a hearing on defendant's competence to stand trial.

We considered a comparable situation in *People v. Welch* (1999) 20 Cal.4th 701, 739, and there concluded that "psychiatric expert testimony presented by the defense at the penalty phase describing [defendant's] considerable mental problems," including delusional paranoid disorder and paranoid schizophrenia (*id.* at p. 727), had no bearing on whether the trial court had erred in earlier failing to declare a doubt as to defendant's competence to stand trial. Similarly here, the trial court could have been under no obligation to suspend proceedings during the guilt phase, before any of the relevant mitigation evidence had been presented to

22

it.  Our decision in *People v. Welch* did not, however, appear to consider the possibility that the trial court might have been obligated to suspend proceedings during *the penalty phase*, once it had heard the testimony of the defense mental health experts.  Under the circumstances of this case, however, we conclude that the trial court did not have such an obligation.

As defendant acknowledges, evidence of mental illness alone is not sufficient to raise a doubt about a defendant's competence to stand trial.  The question is whether defendant's mental illness interfered with his ability to understand the nature and purpose of the criminal proceedings or to communicate with his counsel about his defense.  (See *Rogers*, *supra*, 39 Cal.4th at p. 849; *Mickel*, *supra*, 2 Cal.5th at pp. 203–204.)  "[E]ven a history of serious mental illness does not necessarily constitute substantial evidence of incompetence that would require a court to declare a doubt . . . ."  (*People v. Blair* (2005) 36 Cal.4th 686, 714.)

Here, as defendant notes, the record contains more than just evidence of a history of serious mental illness; some of the penalty phase witnesses described symptoms directly related to his ability to think and communicate logically.  In particular, defendant points to the testimony of Dr. Girgis who testified that defendant's auditory hallucinations interfered with his ability to communicate and that defendant's thought processes were disorganized.  A number of mental health professionals who worked at the jail also testified as to difficulty communicating with defendant, although many of them attributed the difficulty to language barriers.  Witnesses who communicated with defendant in his native Arabic did not report the same difficulties, but they did describe episodes in which defendant appeared to suffer from significant memory lapses.  And as defendant points out, although none of the psychiatrists opined that he was incompetent to stand trial (cf. *Lewis*, *supra*, 43 Cal.4th at p. 525), Dr. Flores-Lopez did testify that he

recommended in April 1999 that defendant be sent to a mental hospital for a competency evaluation.[3]

The difficulty, however, is that the record also indicates that defendant's symptoms fluctuated over time, but does not reveal whether the symptoms these witnesses observed were ones that persisted through trial. While most of the evidence on which defendant relies concerns his condition well before trial began in October 2001, evidence closer in time to the start of the trial paints a somewhat more complex picture. In February 2001, Dr. Johnson noted that defendant's condition was improving with adjustments to his medication, though it appeared to deteriorate again later in the month. In July and August 2001, Dr. Khaled observed that defendant reported improvement, appeared alert and oriented and denied any suicidal or homicidal ideation, although he also reported hearing voices, having memory problems, and feeling depressed. In August 2001, Dr. Johnson noted that defendant denied having any hallucinations or suicidal thoughts, that his hygiene was good, and that he appeared alert and oriented. Also in August 2001, Dr. Khaled reported that defendant told him that he felt "fine." His psychiatric case manager at the jail, King, testified that in September 2001, after he returned from court, he was alert and coherent, and his mood was pleasant and his affect appropriate.

The record contains no evidence about defendant's condition during the trial itself. The omission is noteworthy: Even though defendant's counsel

---

[3] The record contains no indication that such an evaluation occurred. Dr. Flores-Lopez's testimony regarding his recommendation that defendant be sent to a mental hospital for a competency evaluation is not itself substantial evidence of incompetence because Dr. Flores-Lopez did not state with particularity the opinion that defendant was incompetent. (See *Lewis, supra*, 43 Cal.4th at p. 525.) Dr. Flores-Lopez also acknowledged the possibility that defendant might be malingering, and testified that he could not rule out malingering without performing psychological testing.

assembled voluminous evidence concerning defendant's mental health history for presentation at the penalty phase, and engaged a licensed psychologist who testified about the results of his examination of defendant, counsel presented no evidence to the court indicating that defendant was incompetent at the time of trial. Counsel did, however, suggest that defendant's condition had generally improved in the year before trial:  In her closing argument, defense counsel described defendant's mental condition as having fluctuated over time, but as having "stabilize[d] a bit" over the previous year as his medications were adjusted.[4] Counsel raised no doubts about defendant's competence at any point during the proceedings.

Given the nature of the mitigation evidence on which defendant relies, counsel's actions are significant.  "Although trial counsel's failure to seek a competency hearing is not determinative [citation], it is significant because trial counsel interacts with the defendant on a daily basis and is in the best position to evaluate whether the defendant is able to participate meaningfully in the proceedings."  (*Rogers*, *supra*, 39 Cal.4th at p. 848; cf. *Medina v. California* (1992) 505 U.S. 437, 450 ["defense counsel will often have the best-informed view of the defendant's ability to participate in his defense"].)  Here, defense counsel not only interacted with defendant, but also, as the trial court was well

_____

[4]     Defense counsel described defendant's mental illness to the jury in arguing that it was a mitigating factor, though not a legal excuse for his actions:  "I'm not arguing to you now that this illness was [*sic*] rendered him incapable of making choices. . . .  No one ever argued to you that he wasn't capable of making the decision to do what he did in this case.  And that might have been a defense if he were so sick that he had no clue about what he was doing, but no one ever argued that to you."  She continued:  "Precisely because he made choices, he's going to be locked up forever.  The difference is because of the flawed quality of his ability to make those choices, because his options are not the options that a truly evil person has, the appropriate punishment is no more than locking him up in an isolated cell for the rest of his life."

25

aware, had undertaken an in-depth investigation of defendant's history of mental illness. Under the circumstances, the trial court reasonably could have ascribed some weight to trial counsel's failure to raise concerns about defendant's competence at any point during the proceedings.

The circumstances of this case distinguish it from other cases on which defendant relies, including *Drope*. In *Drope*, the defendant was charged with rape of his wife, and the trial court rejected defense counsel's request for a continuance to allow for psychiatric examination before trial. (*Drope*, *supra*, 420 U.S. at pp. 164–165.) This motion was accompanied by a psychiatric evaluation, which included some observations suggesting the defendant was competent—for example, he was " 'well oriented' " and was able to answer questions testing judgment, but the psychiatrist diagnosed the defendant with " '[b]orderline mental deficiency' and '[c]hronic [a]nxiety reaction with depression' " and noted that the defendant " 'had a difficult time relating,' and that he 'was markedly circumstantial and irrelevant in his speech.' " (*Id.* at pp. 175–176.) At trial, the court heard testimony from the defendant's wife about the defendant's mental state; she testified that at first, she had believed her husband "needed psychiatric care" (*id.* at p. 166) and should not be prosecuted, but also stated that she "was not convinced petitioner was sick after talking to his psychiatrist" and had changed her mind about prosecution because the defendant had tried to choke her to death the Sunday before the trial began. (*Ibid.*) Midway through the trial proceedings, the defendant attempted suicide. (*Ibid.*) The United States Supreme Court held that the defendant's attempted suicide, the psychiatrist's report, and the defendant's wife's testimony, "when considered together . . . created a sufficient doubt of [the defendant's] competence to stand trial to require further inquiry on the question." (*Id.* at p. 180.) Here, by contrast, the record contains no evidence concerning defendant's impaired mental condition immediately before or during trial, and his

26

counsel raised no concerns based either on her interactions with defendant or her investigation of his mental health.

This case is also unlike *Maxwell v. Roe* (9th Cir. 2010) 606 F.3d 561. In that case, defense counsel had successfully moved for a Penal Code section 1368 hearing during pretrial proceedings, at the conclusion of which the defendant was found competent; four of five psychiatrists to evaluate the defendant had concluded that he was malingering. But during trial, the defendant's behavior "in and outside the courtroom was erratic, irrational, and disruptive," the defendant exhibited "irrational and paranoid behavior," and the defendant frequently refused to take his antipsychotic medications as prescribed. (*Id*. at pp. 565, 570; see *id.* at pp. 566, 571.) The defendant also attempted suicide halfway through trial and was placed on a psychiatric hold pursuant to Welfare and Institutions Code section 5150. (*Id.* at pp. 565–566.) Although defense counsel again raised concerns about the defendant's competence, the trial court reviewed the psychiatrists' findings from the earlier competency hearing, concluded that the defendant was malingering, and did not hold a second competency hearing. (*Id.* at p. 565.) The United States Court of Appeals for the Ninth Circuit granted federal habeas corpus relief, explaining that "attempted suicide—taken in the context of his pre-trial behavior, strained communication with defense counsel, mental health history, antipsychotic medications, and subsequent psychiatric detentions—would have raised a doubt in a reasonable judge." (*Id.* at p. 571.) Again, while the record in this case contains considerable evidence that defendant had a history of serious mental illness, it does not contain evidence tending to show that defendant suffered relevant mental impairments during trial or was unable to communicate effectively with counsel, and his counsel raised no such concerns.

Ultimately, although defense counsel's penalty phase mitigation evidence showed that defendant suffered from serious mental illness, we conclude that the

mitigation evidence did not constitute substantial evidence of present incompetence that required the trial court, on its own motion, to declare a doubt and conduct a competence hearing during the penalty phase of trial. The record before us likewise provides insufficient evidence to demonstrate that defendant was actually incompetent during trial.

## B. Constitutionality of the Death Penalty for Mentally Ill Defendants

At the penalty phase, defense counsel argued that defendant's mental illness mitigated his culpability for the crime and warranted a verdict of life without possibility of parole. After the jury returned a verdict of death, defendant moved to modify the verdict on the ground that execution of a defendant who was mentally ill at the time of his offense violates the due process clause and the Eighth Amendment's prohibition against cruel and unusual punishment. The trial court rejected the argument. Defendant now renews the argument before this court.

Defendant's argument relies on *Atkins v. Virginia* (2002) 536 U.S. 304, which holds that the Eighth Amendment to the United States Constitution prohibits imposition of the death penalty on persons with intellectual disabilities, and *Roper v. Simmons* (2005) 543 U.S. 551, which reached a similar conclusion concerning persons who were juveniles at the time of their offenses. He contends that the evidence at trial showed that he suffered from cognitive impairments that reduced his culpability in a manner similar to persons with intellectual disabilities or juvenile offenders, and that the death penalty is therefore a similarly disproportionate punishment for his crime.

We have previously rejected similar claims, explaining that the logic of *Atkins* and *Roper* does not extend to the class of offenders with mental illness. (See *People v. Mendoza* (2016) 62 Cal.4th 856, 908–909.) In *Mendoza*, we first

28

explained that, while *Atkins* and *Roper* had relied on the emergence of a national consensus against the imposition of the death penalty in cases of intellectual disability and in cases involving juvenile offenders, there exists no similar evidence that a national consensus has formed against the imposition of the death penalty against the class of persons with mental illness. (*Mendoza*, at p. 909.) We then went on to explain: " '[T]he circumstance that an individual committed murder while suffering from a serious mental illness that impaired his judgment, rationality, and impulse control does not necessarily mean he is not morally responsible for the killing. There are a number of different conditions recognized as mental illnesses, and the degree and manner of impairment in a particular individual is often the subject of expert dispute. Thus, while it may be that mentally ill offenders who are utterly unable to control their behavior lack the extreme culpability associated with capital punishment, there is likely little consensus on which individuals fall within that category or precisely where the line of impairment should be drawn. . . . We leave it to the Legislature, if it chooses, to determine exactly the type and level of mental impairment that must be shown to warrant a categorical exemption from the death penalty.' " (*Ibid.*, quoting *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1252 (*Hajek and Vo*).) Finally, we explained that, to the extent that *Atkins* and *Roper* were concerned with the risk of "unjustified or mistaken execution" in the case of persons with intellectual disabilities and juvenile offenders, significant variations in the forms and nature of mental illness make it difficult to say that impaired competence is a feature common to the class. (*Mendoza*, at p. 910; see *id.* at p. 911.) We noted all defendants, in any event, "have the opportunity to establish that they are not competent to stand trial." (*Id.* at p. 911.)

Defendant acknowledges that there "currently is no legislative action or jury behavior reflecting a consensus against applying the death penalty for those

with severe mental illness." But he notes that several high court justices in other states have written concurring or dissenting opinions that in some way "cast doubt over the appropriateness of subjecting people with severe mental disorders to the death penalty." These separate opinions do not, however, establish a national consensus. Moreover, several of the opinions are in fact consistent with our prior conclusion that, because mental illness is "a much broader category" than intellectual disability, "with wide ranges of diagnoses and periods of decompensation and remission," the lines should be drawn by a legislature rather than by a court. (*State v. Ketterer* (Ohio 2006) 855 N.E.2d 48, 86 (conc. opn. of Lundberg, J.); see *Commonwealth v. Baumhammers* (Pa. 2008) 960 A.2d 59, 106 (conc. opn. of Todd, J.); accord, *Hajek and Vo*, *supra*, 58 Cal.4th at p. 1252.)

Defendant also relies on materials such as position statements of certain mental health organizations, a 2002 public opinion poll, and a 2004 United Nations resolution urging states with the death penalty not to impose it on, or execute, " 'a person suffering from any form of mental disorder.' " We have previously found these sorts of materials insufficient to demonstrate emerging standards that warrant reexamination of our precedent. (*People v. Mendoza*, *supra*, 62 Cal.4th at p. 910.) Defendant further notes that, before Connecticut abolished the death penalty,[5] it had prohibited the imposition of the death penalty where the trier of fact found that, at the time of the offense, "the defendant's mental capacity was significantly impaired or the defendant's ability to conform the defendant's conduct to the requirements of law was significantly impaired but

---

[5] The Connecticut Legislature prospectively abolished the death penalty for crimes occurring after April 25, 2012. The Connecticut Supreme Court later invalidated the remainder of the death penalty law under the Connecticut Constitution. (*State v. Peeler* (Conn. 2016) 140 A.3d 811; *State v. Santiago* (Conn. 2015) 122 A.3d 1.)

30

not so impaired in either case as to constitute a defense to prosecution." (Conn. Gen. Stat., § 53a-46a(h).) The legislative act of a single state does not, however, demonstrate an emerging national consensus. Our Legislature, of course, may adopt a similar standard if it so chooses. (See *Hajek and Vo*, *supra*, 58 Cal.4th at p. 1252.)

Defendant next invokes *Panetti v. Quarterman* (2007) 551 U.S. 930, which concerned application of the Eighth Amendment rule forbidding the execution of a prisoner who may have been found competent at earlier stages of the proceedings but is found to be incompetent at the time of execution. Without attempting to "set down a rule governing all competency determinations" (*id.* at pp. 960–961), the high court in *Panetti* explained that a court evaluating a claim of incompetence to be executed should have considered evidence that the prisoner "suffer[ed] from a severe, documented mental illness that is the source of gross delusions preventing him from comprehending the meaning and purpose of the punishment to which he has been sentenced" (*id.* at p. 960). "Gross delusions stemming from a severe mental disorder," the court explained, "may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose." (*Ibid.*) Defendant argues that this logic suggests that persons suffering from major mental illnesses with psychotic features should be ineligible for the death penalty by reason of their impaired comprehension. But even assuming *Panetti* is relevant to defendant's challenge to his sentence (as opposed to its execution), *Panetti* says that execution is barred if the nature of a prisoner's mental illness is such that it prevents him from understanding the meaning and purpose of the penalty to be carried out, and defendant points to no evidence in the record to indicate that his mental illness necessarily has these effects. To the extent defendant is making a claim of incompetence to be executed, such an argument is premature: Under California

31

law, competence to be executed is an inquiry to be undertaken only after the date of execution has been set. (See *People v. Kelly* (1992) 1 Cal.4th 495, 544–545 & fn. 11; Pen. Code, § 3700.5.) We express no view as to the merit of any claim of incompetence that defendant might raise at that time.

### C. Sufficiency of Evidence of First Degree Murder and Special Circumstance

Defendant contends there was insufficient evidence of first degree murder based either on a premeditated and deliberate murder theory or a felony-murder theory. He also argues that there was insufficient evidence to support a true finding on the special circumstance allegation. We address these contentions in turn.

### 1. *First degree murder*

The jury was instructed that a verdict of first degree murder required a finding that defendant acted with premeditation and deliberation, or that the killing occurred during the commission or attempted commission of a lewd act on a child. (See Pen. Code, §§ 187, 189, 288.) Defendant contends there was insufficient evidence for a reasonable trier of fact to find him guilty of first degree murder on either basis.

We have previously described the role of the reviewing court in evaluating sufficiency of the evidence claims: " '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a *reasonable trier of fact* could find the defendant guilty beyond a reasonable doubt.' " (*People v. Guiton* (1993) 4 Cal.4th 1116, 1126.) " ' "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two

32

interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' " ' " ' " (*People v. Tully* (2012) 54 Cal.4th 952, 1006– 1007.) When "there are two possible grounds for the jury's verdict, one unreasonable and the other reasonable, we will assume, absent a contrary indication in the record, that the jury based its verdict on the reasonable ground." (*Guiton*, *supra*, at p. 1127.)

### i. *Premeditated and deliberate murder*

First, defendant argues there is insufficient evidence to support a finding of guilt based on premeditated and deliberate murder. We disagree.

" 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. . . . "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. . . . "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1224.) In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27, we identified three categories of evidence that tend to establish a premeditated and deliberate murder—planning, motive, and method. "But these categories of evidence . . . 'are descriptive, not normative.' (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) They are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was

33

the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' " (*Cole*, *supra*, at p. 1224.)

Defendant stresses that the prosecution never presented evidence of extensive planning. The jury was, however, entitled to consider evidence showing that defendant had previously threatened to kill Delgado in considering whether the murder was premeditated. (Cf. *People v. Brooks* (2017) 3 Cal.5th 1, 41 [evidence of prior threats relevant to show premeditation].) Alfonso Solano testified that Delgado approached him outside a liquor store and told him that defendant was going to kill him; Solano later heard defendant tell Delgado, " 'I will kill you and eat your pee-pee.' " Defendant killed Delgado approximately one month later. The jury further heard evidence that when Delgado's remains were found, his penis was missing.

Defendant argues that the evidence showed he went to Home Depot and Super Kmart to buy cement and other materials only after the killing occurred, which reflects a lack of preparation that is inconsistent with premeditated and deliberate murder. But even accepting the latter premise for the sake of argument, there was no testimony establishing the precise time of Delgado's death. As a result, although there was no evidence to show that the cement and other purchases were made before Delgado's death, there was no evidence to show the purchases were made after Delgado's death, either. Viewing the evidence in the light most favorable to the judgment, we conclude the evidence was sufficient to support a finding of premeditated and deliberate murder.

### ii. Felony murder

Defendant next argues that there is insufficient evidence to support a finding of guilt based on felony murder, where the predicate felony was sexual molestation in violation of Penal Code section 288. Section 288 prohibits "any

lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child." (Pen. Code, § 288, subd. (a).) A murder committed "in the perpetration of, or attempt to perpetrate," a violation of section 288 is first degree murder. (*Id.*, § 189.)

"For felony murder, the required mental state is the specific intent to commit the underlying felony. [Citation.] The killing is considered to be committed in the perpetration of the underlying felony if the acts were part of a continuous transaction. [Citation.] No strict causal or temporal relationship between the murder and underlying felony is required." (*People v. Booker* (2011) 51 Cal.4th 141, 175 (*Booker*).)

Defendant argues there is no "solid" evidence to show that defendant touched or attempted to touch Delgado in a lewd manner. Defendant emphasizes that there was no evidence of anal tearing or trauma to Delgado's body. This is true, as far as it goes; Delgado's pelvis was not recovered for more than a year after his death and showed substantial signs of decomposition that made it difficult to evaluate any tearing. In any case, there was circumstantial evidence of molestation: Delgado's clothes were found on a shelf in defendant's home, and his remains were found undressed. Though the police found most of Delgado's remains, his penis had been severed from his body and was never recovered. And there was direct evidence as well: an analyst and an expert witness testified to the presence of sperm cells in Delgado's anus.

Defendant notes that there were conflicting opinions on whether sperm cells could be identified, and argues that, even assuming there were sperm cells in Delgado's anus, no evidence conclusively linked the cells to defendant. Defendant argues that it would be more reasonable for the jury to infer that any sperm found in the victim's anal area was the victim's own sperm; defendant

35

suggests that the victim's sperm may have been deposited in his anal area when his testicles or vas deferens was severed. We reject the argument. Our decision in *People v. Kraft* (2000) 23 Cal.4th 978 (*Kraft*) is instructive. In that case the defendant was convicted of the first degree murder and sodomy of Michael Joseph Inderbieten, and the jury found true the special circumstance allegation of murder in the commission of sodomy. (Pen. Code, §§ 187, 286, 190.2, subd. (a)(17)(D).) Anal swabs taken from the victim revealed sperm that may have come from the victim or the defendant, and the pathologist found no signs of trauma to the rectum. The defendant thus argued that the sperm belonged to the victim. But the victim was found with his pants partially pulled down, exposing his buttocks, and there was no evidence that the victim had ejaculated. "On these facts, including the condition of the victim's clothing," we concluded, "the jury reasonably found defendant committed the sodomy of Inderbieten . . . ." (*Kraft*, *supra*, at p. 1059.) We reach much the same conclusion here: though witnesses for the prosecution and the defense presented conflicting views as to whether the cells found in Delgado's anus were sperm, the jury could have reasonably credited those witnesses who concluded that it was sperm. And given the condition of the body when it was found, as well as the location of Delgado's clothes in defendant's shed, it was not unreasonable for the jury to infer that the sperm was defendant's, as opposed to Delgado's or that of a third party.

Defendant also argues that it is no more likely that any penetration occurred after Delgado's death than before, because there is no proof that defendant sought to engage in a lewd or lascivious act with Delgado while he was alive. He further argues that if the sexual activity occurred after Delgado's death, it could not serve even as an attempted violation of Penal Code section 288. As to the first point, we rejected a similar argument in *Kraft*, explaining: " '[I]n the absence of any evidence suggesting that the victim's assailant intended to have sexual conduct

36

with a corpse [citation], we believe that the jury could reasonably have inferred from the evidence that the assailant engaged in sexual conduct with the victim while [he] was still alive rather than after [he] was already dead.' " (*Kraft*, *supra*, 23 Cal.4th at p. 1060.)  As to the second point, in a case involving felony murder based on rape or the commission of a lewd or lascivious act by force, we have explained:  "Intercourse after death does not necessarily negate the felony-murder rule or the rape-murder special-circumstance finding, as postmortem intercourse could constitute an attempt to commit rape, provided it was part of a continuous transaction and the intent to commit rape was formed prior to the murder. [Citation.]  The same is true for a postmortem lewd act." (*Booker*, *supra*, 51 Cal.4th at p. 175.)  Here, it was reasonable for the jury to conclude that defendant completed or attempted a lewd or lascivious act while Delgado was alive, or at least as part of the same "continuous transaction." (*Ibid.*)  This satisfies the requirements for felony murder because Delgado was killed "in the perpetration of, or attempt to perpetrate," a violation of Penal Code section 288.  (Pen. Code, § 189; see *Booker*, *supra*, at p. 175.)

Defendant also argues that the prosecutor did not present reliable evidence that Delgado was under 14 years of age, a necessary element of Penal Code section 288's prohibition on a lewd and lascivious act "upon or with the body . . . of a child."  The argument lacks merit.  A classmate of Delgado's testified that Delgado was 12 and two classmates testified that Delgado was in the sixth grade at the time of his death.  It is well settled that "unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)  Here, the relevant testimony was both uncontested and uncontradicted at trial.  There was sufficient evidence for the jury in this case to conclude beyond a reasonable doubt that the victim was under the age of 14.

## 2. *True finding of special circumstance of commission or attempt of lewd and lascivious act on a child*

The jury found true the special circumstance that defendant committed first degree murder while "engaged in . . . the commission of, [or] attempted commission of . . . or attempting to commit . . . [¶] . . . [¶] . . . a lewd or lascivious act upon the person of a child under the age of 14 years," a violation of Penal Code section 288. (Pen. Code, § 190.2, subd. (a)(17)(E).) "A jury's true finding on a special circumstance allegation must be supported by substantial evidence." (*People v. Boyce* (2014) 59 Cal.4th 672, 691.) Because the jury's finding of guilt based on felony murder was also predicated on establishing that defendant violated Penal Code section 288, and we have concluded that there was sufficient evidence on which the jury could have based that conclusion, the same is true for the special circumstance.

## D. Exclusion of Testimony Regarding the Victim's Relationships

Defendant contends that the trial court violated his federal and state constitutional rights to present a complete defense, to a fair trial, and to a reliable guilt and penalty determination when it excluded witness testimony that purported to show that the victim often sought out the companionship of adult men. Defendant's argument lacks merit.

Defendant sought to introduce testimony from various employees of local businesses and their customers, who would have described the victim's routine of hanging around those businesses late into the night. Defense counsel argued that the testimony would have shown that Delgado sought out and attached himself to adults, which was relevant to "negate a presumption that the nature of [defendant's] relationship with Juan Delgado was a desire for sex." The trial court excluded the testimony, concluding that any evidence describing Delgado's general interactions with customers and employees at local businesses was

38

irrelevant because such evidence had no tendency to prove or disprove that *defendant* molested Delgado.

The defense also sought to introduce the testimony of Oscar Leon about a night he spent with Delgado in February 1998. Leon met Delgado at a donut shop and ended up driving him around the neighborhood in search of his mother. After they spent several hours in the car sleeping, Leon took him to the police station at 6:00 a.m. Defense counsel argued that Leon's testimony was necessary to show that Delgado sought out the company of adults and avoided going home at night, thereby creating the inference that an adult male other than defendant could have been the source of any sperm found in Delgado's rectal area. The trial court excluded this evidence as irrelevant because a jury could not have reasonably inferred that defendant had or had not molested Delgado based on Delgado's earlier interactions with other adults. The trial court also noted that any such inference would be speculative because Leon's interaction with Delgado had occurred a month before Delgado's death.

Evidence Code section 350 provides that only relevant evidence is admissible. Evidence Code section 210, in turn, defines relevant evidence as that "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." " ' " 'The test of relevance is whether the evidence tends " 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." ' " ' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 913 (*Hamilton*).)

"Inferences drawn from the evidence must be logical and reasonable, not merely speculative." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405.) In order for evidence suggesting third party culpability to be relevant, and thus admissible, the evidence "need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a

39

reasonable doubt of defendant's guilt." (*People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).)  Moreover, "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt:  there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Ibid.*)  Without this link, such evidence is irrelevant and cannot be admitted. (*Ibid.*)

Under Evidence Code section 352, the trial court may also exercise its discretion to exclude evidence if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

" ' " 'The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence.' " ' " (*Hamilton*, *supra*, 45 Cal.4th at p. 913.)  " 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' " (*Mickel*, *supra*, 2 Cal.5th at p. 218.)  Rather, "[c]ourts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." (*Hall*, *supra*, 41 Cal.3d at p. 834.)  We review the trial court's ruling to exclude evidence as irrelevant for abuse of discretion. (*Mickel*, *supra*, at p. 219.)

The trial court did not abuse its discretion in excluding these witnesses' testimony.  The mere fact that Delgado had interacted with adults is not logically related to the circumstances of his death or defendant's motive for spending time with Delgado.  Moreover, the victim's interactions with adults did not tend to prove or disprove that defendant engaged in an act of sexual molestation at the time of the offense because the excluded testimony concerning those interactions was of such a generalized nature.

40

To the extent that Leon's testimony might have supported a suggestion that another party could have been the source of the identified sperm, the trial court did not abuse its discretion in excluding the testimony, because such evidence raised no more than a " 'possible suspicion' " of another party's guilt. (*Hall*, *supra*, 41 Cal.3d at p. 832.) Without providing a stronger link between Leon and the offense here, defendant cannot introduce his testimony solely to suggest that defendant was not the sole possible source of the sperm. In *People v. Edelbacher* (1989) 47 Cal.3d 983, 1017–1018, the defendant attempted to show the possible motives of third parties to kill the victim by offering evidence that the victim had associated with drug dealers; defense counsel argued that " 'people who are dealing in narcotics frequently end up injured or shot.' " We concluded that the evidence was properly excluded, because "evidence showing only a third party's possible motive is not capable of raising a reasonable doubt of a defendant's guilt and is thus inadmissible." (*Id.* at p. 1018.) Similarly here, evidence showing only a third party's possible opportunity is inadmissible; defense counsel's efforts to suggest that Leon or another adult male could have molested the victim are overly speculative. The exclusion of this irrelevant evidence did not violate defendant's constitutional rights.

### E. Murder Charge in Information and Conviction of Murder

Defendant was charged in an information with committing murder with malice aforethought in violation of Penal Code section 187, subdivision (a), as well as the special circumstance of committing murder while engaged in a violation or attempted violation of Penal Code section 288. Defendant argues that the trial court erred in instructing the jury on first degree murder because the information charged only second degree murder. As appellant acknowledges, this court has repeatedly held that a defendant may be convicted of first degree murder

41

even if the indictment or information specifies only that the defendant is charged with murder in violation of Penal Code section 187. (See *People v. Contreras* (2013) 58 Cal.4th 123, 147 (*Contreras*), citing cases.) We have explained: "Malice murder and felony murder are two forms of the single statutory offense of murder. Thus, a charge of murder not specifying the degree is sufficient to charge murder in any degree. The information also need not specify the theory of murder on which the prosecution relies at trial." (*Ibid.*)

Defendant argues these decisions were incorrectly decided because Penal Code "section 189 [is] a statutory enactment of the first degree felony-murder rule in California" (*People v. Dillon* (1983) 34 Cal.3d 441, 472 (*Dillon*)), and under *People v. Carpenter* (1997) 15 Cal.4th 312, 394, there is "only a 'single, statutory offense of first degree murder.' " Defendant contends that Penal Code section 189 must be the " 'single[,] statutory offense' " referred to in *Carpenter*, such that the prosecution's failure to refer to section 189 in his indictment requires us to reverse defendant's conviction. We have previously rejected this argument as well, explaining that " '*Dillon* made it clear that section 189 serves *both* a degree-fixing function and the function of establishing the offense of first degree felony murder. [Citation.] It defines second degree murder as well as first degree murder. Section 187 also includes both degrees of murder in a more general formulation.' " (*Contreras*, *supra*, 58 Cal.4th at p. 148, quoting *People v. Harris* (2008) 43 Cal.4th 1269, 1295.) *Carpenter*, for its part, did not hold that there is a single statute defining first degree murder for pleading purposes, and "a decision is not authority for propositions not considered." (*People v. Toro* (1989) 47 Cal.3d 966, 978, fn. 7.) We accordingly reject defendant's claim.

Defendant also argues that reversal is required under *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), which holds that, under the Sixth and Fourteenth Amendments to the United States Constitution, " 'any fact . . . that

42

increases the maximum penalty for a crime must be *charged in an indictment*, submitted to a jury, and proven beyond a reasonable doubt.' " (*Apprendi*, at p. 476, italics added.) We have previously rejected this argument as well: "[E]ven assuming, for the sake of argument, that *Apprendi* required that a fact *increasing* the maximum penalty must be pleaded with greater specificity than previously, it would not require greater specificity in pleading first degree murder, because the maximum penalty for first degree murder in the absence of special circumstances (life imprisonment) is not greater than the maximum penalty for second degree murder, which like first degree murder carries a maximum penalty of life imprisonment." (*People v. Famalaro* (2011) 52 Cal.4th 1, 37.) Here, as in *Famalaro*, "defendant was sentenced to death, a greater punishment than life imprisonment. But the special circumstance allegations that made him eligible for that penalty *were* specifically pleaded," so the procedures followed here do not offend the principles of *Apprendi*. (*Famalaro*, at p. 37.)

## F. Failure to Require Unanimity on Theory of First Degree Murder

The trial court instructed the jury on two theories of first degree murder, premeditated murder and felony murder, but did not instruct the jury to agree on the theory of murder. Defendant argues the failure to require jury unanimity on one of these two theories violated his federal and state constitutional rights because the two types of murder are based on different elements. Defendant points to language in *Dillon*, *supra*, 34 Cal.3d at page 476, to suggest that the crimes "differ in a fundamental respect" and require the prosecution to prove different elements—deliberate and premeditated murder requires malice, while felony murder does not. But as we have previously explained, "[p]remeditated murder and felony murder are not distinct crimes; rather, they are alternative theories of liability, and jurors need not unanimously agree on a particular theory

43

of liability in order to reach a unanimous verdict." (*Sattiewhite*, *supra*, 59 Cal.4th at p. 479, citing *People v. Benavides* (2005) 35 Cal.4th 69, 101.) We decline to revisit these well-established principles here.

## G. Instructions Involving the Reasonable Doubt Standard

Defendant argues that, taken together, the jury instructions "undermined and diluted" the jurors' duty to determine guilt beyond a reasonable doubt, in violation of his federal constitutional rights to due process and trial by jury. (See *In re Winship* (1970) 397 U.S. 358, 364.) We find no error and reject defendant's claims.

First, defendant points to the set of instructions that describe the relationship between the reasonable doubt requirement and circumstantial evidence, CALJIC Nos. 2.01, 2.02, 8.83, and 8.83.1. Defendant argues that the instruction to accept "reasonable" interpretations of circumstantial evidence, and to reject unreasonable interpretations, improperly directed jurors to reach a finding of guilt if such an interpretation appears reasonable, and ultimately led the jury to believe it could convict appellant on a constitutionally inadequate standard of proof. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, § 17.) We have rejected similar arguments in the past, and do the same here. The jury was properly instructed with CALJIC No. 2.90, which establishes the prosecution's burden of establishing the defendant's guilt "beyond a reasonable doubt." Instructing the jury that any inferences it draws must be "reasonable" does not vitiate this standard of proof, nor does it create an " ' "impermissible mandatory conclusive presumption of guilt." ' " (*People v. Wilson* (2008) 43 Cal.4th 1, 23.) Rather, "these instructions properly direct the jury to accept an interpretation of the evidence favorable to the prosecution and unfavorable to the defense only if no

44

other 'reasonable' interpretation can be drawn." (*People v. Kipp* (1998) 18 Cal.4th 349, 375.)

Defendant also points to the instructions regarding evidence of guilt (CALJIC No. 2.01), discrepancies in testimony (CALJIC No. 2.21.1), willfully false testimony (CALJIC No. 2.21.2), and conflicting testimony (CALJIC No. 2.22). These instructions guide the jury's assessment of witness credibility and set out the bases on which the jury may give greater or lesser weight to testimony. Defendant argues that each of these instructions undermines the "reasonable doubt" standard of proof by presenting a lesser standard of proof for a particular piece of evidence, violating defendant's constitutional rights to due process, a fair trial, and trial by jury. (U.S. Const., 5th, 6th, 8th & 14th Amends.) In other cases where the jury was also instructed with CALJIC No. 2.90, which establishes the prosecution's burden of proof, along with one or more of the instructions to which defendant objects, we have rejected any claim that the instruction improperly decreased or shifted the burden of proof, and we do the same here. (*People v. Samuels* (2005) 36 Cal.4th 96, 131 [rejecting argument that CALJIC No. 2.01 undermines requirement of proof beyond a reasonable doubt]; *People v. Crew* (2003) 31 Cal.4th 822, 848 [same, as to CALJIC No. 2.22]; *People v. Carey* (2007) 41 Cal.4th 109, 130–131 (*Carey*) [same, as to CALJIC Nos. 2.21.1 & 2.21.2].)

Similarly, defendant argues that CALJIC No. 2.27, which addresses the sufficiency of the testimony of one witness to prove a fact, improperly suggests that the defense has the burden of proving facts, reducing the prosecution's burden of proof in violation of defendant's rights to due process and a fair jury trial. (U.S. Const., 6th & 14th Amends.) We rejected a similar claim in *Carey*, *supra*, 41 Cal.4th at page 131, and we do so here as well.

45

Finally, defendant takes issue with the instruction regarding premeditated and deliberate murder, CALJIC No. 8.20, which directs the jury to determine whether a killing was murder of the first degree if it was "the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition *precluding* the idea of deliberation." (Italics added.) Defendant argues that the use of the word "precluding" places an impermissible burden on the defendant to eliminate the possibility of premeditation. We have rejected this claim before, and we do so again here. (*People v. Jurado* (2006) 38 Cal.4th 72, 127.)

### H. Claim of Prosecutorial Misconduct

Defendant contends that the prosecutor committed prejudicial misconduct through a variety of penalty phase references to Osama bin Laden, Al Qaeda, and the terrorist attacks of September 11, 2001, which had taken place less than two months before the trial began. Defendant argues that the prosecution "fueled anti-Arab sentiment" by making these references. We conclude that defendant has forfeited these claims, and they fail on the merits in any event.

During the penalty phase, seeking to provide an example of what it means to be "evil," the prosecutor asked a defense witness who was testifying to defendant's mental health whether Osama bin Laden was evil. Later, in his closing argument, the prosecutor addressed whether persons with delusions can still be held responsible for their actions, stating: "You know what's interesting? . . . It's interesting to think about this whole notion of delusions or hallucinations. And I was thinking about, you know, when you think about the religions of the world, not that I'm any expert on the religions of the world, but I think about, you know, Moses talking about God speaking to him from a burning bush. And the finger of God coming out and writing the 10 commandments. . . . Islam was given

46

to Mohammed in [a] dream. All right? These were delusional people under today's psychiatry. Now, I'm not saying—I'm not trying to make more of that than it is, but what I am telling you is it is interesting because psychiatry doesn't seem to really fit there for whatever that's worth. And psychiatry would seem to want to label with a mental disorder any bad behavior. You know those—and I'm just giving an example. I'm not trying to make more of this than it is, but, I mean, you know, those—these people in Al Qaeda, they're all schizophrenic because they all became suicide bombers because they had this vision that there's going to be 48 or 50 virgins waiting for them on the other side. And maybe they were. Maybe they were because the numbers are so great of people who are—you know, who are schizophrenic. But it doesn't stop them from doing evil acts. And nothing about the defendant's mental disturbance stopped him from doing evil acts."

The prosecutor also referred to September 11 while urging the jury to consider the moral gravity of a decision whether to issue the death sentence: "And so here's the government represented by me. You know, I'm in essence the government speaking, and I'm saying, 'Take a life. Take a life.' And it's not easy for me to do. . . . You know, we are a compassionate people. We have, out of the tragedy that happened in September, we found out how compassionate we are. There's just an outpouring of support and patriotism, whatever you want to call it, we have that in our makeup. Here's somebody from the government saying, 'let's execute somebody; let's execute a man, a person that's in this courtroom.' All right? So I'm in that position that's rather odd, frankly, and that's strange for me and, perhaps, is for you as well and the defense attorneys."

Defendant also points to the prosecutor's references to defendant's national origin: "I'm trying to talk about someone . . . who has all these capabilities. . . . He managed to immigrate to America. He managed to get out of Egypt and to

47

work his way here. He did it. Okay? To beg for money. To buy food. You heard people talk about coming into the store [to] buy soda, to buy chicken, and ask them to put three chickens in a plastic bag. . . . He's able to pay . . . $100 a month for a shed. Able to do that. No one is having—seeing him responding to internal stimuli out in the street. No one is talking about that going on. [¶] He's able to prey on a child. He's not a rabid dog who's just automatically aggressive and violent who's just turned on—who's just biting and biting and biting. He's able to choose when he wants to be violent. He's able to choose when he wants to satisfy his grotesque, perverse sexual needs. He's able to make that choice. He is not a robot. He's not a rabid dog." The prosecutor also stated: "Mr. Ghobrial came into this country and within a short period of time he committed the ultimate crime. He committed the ultimate felony."

Finally, defendant points to one reference to "terrorists" during the prosecutor's guilt phase closing argument. The comment arose while the prosecutor sought to undermine the defense expert's insistence that a sperm cell's head and tail are necessary for identification, consistent with FBI protocol. The prosecutor stated, "the FBI right now is out there trying to hunt down terrorists. I'm not trying to take a shot at them." The prosecutor then criticized the FBI's protocol for sperm identification, characterizing it as being "in the minority." Though defendant concedes that this single reference did not constitute misconduct, he urges us to consider the cumulative effect of all references to September 11 and terrorists throughout the guilt and penalty phases.

We evaluate these comments according to a well-established framework. "A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." (*People v. Avila* (2009) 46 Cal.4th 680, 711.) " 'As the United

48

States Supreme Court has explained, the prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." (*Berger v. United States* (1935) 295 U.S. 78, 88.)' " (*People v. Hill* (1998) 17 Cal.4th 800, 820.) A prosecutor is, however, " ' " 'given wide latitude during argument,' " ' " and may draw from matters that are " ' " 'not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' " ' " (*Id.* at p. 819.)

If we do find misconduct occurred during the penalty phase, "we will affirm the judgment unless we conclude there is a reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict had the error or errors not occurred." (*People v. Brown* (1988) 46 Cal.3d 432, 448.) In general, we will not find brief, passing comments by the prosecutor to be prejudicial. (See *People v. Wrest* (1992) 3 Cal.4th 1088, 1107.) "For prosecutorial misconduct at the penalty phase, we apply the reasonable-possibility standard of prejudice[,]" which is the " 'same in substance and effect' as the beyond-a-reasonable-doubt test for prejudice articulated in *Chapman v. California* (1967) 386 U.S. 18." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1092.)

To preserve such a claim for appeal, the " 'defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]' [Citation.] A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm." (*People v. Linton* (2013) 56 Cal.4th 1146, 1205 (*Linton*).)

Defendant concedes that he objected to only one of the prosecutor's comments, when he referred to Osama bin Laden as an illustration of "an evil

man" while questioning a psychiatrist who had testified for the defense. The trial court sustained the objection. Because defendant objected only on the grounds of relevance and sought no admonition, this claim is forfeited. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841; *People v. Lopez* (2013) 56 Cal.4th 1028, 1073.) We are, furthermore, unpersuaded by defendant's conclusory assertion that no admonition could have cured the prejudicial effect of the comments taken together because the mere mention of the September 11 attacks, just months after those events, "fueled an already incendiary situation [and] encouraged the jurors to act on latent biases." Defendant's misconduct claims with respect to all comments are forfeited.

In any event, defendant's claims lack merit. Although the prosecutor briefly referred to Osama bin Laden, Al Qaeda, and the terrorists who perpetrated the September 11 attacks, the prosecutor never suggested that defendant's crime was somehow comparable to those attacks or that defendant was equally worthy of condemnation. Indeed, the prosecutor's references were not clearly directed at defendant at all, but were instead designed to illustrate general legal points relevant to the prosecutor's argument. The prosecutor did not commit misconduct. (Compare *People v. McDermott* (2002) 28 Cal.4th 946, 1003 (*McDermott*) [finding no misconduct where the prosecutor compared the defendant to "a Nazi working in the crematorium by day and listening to Mozart by night" because the prosecutor "was not comparing defendant's conduct in arranging [the] murder with the genocidal actions of the Nazi regime," and instead "was arguing that human beings sometimes lead double lives, showing a refined sensitivity in some activities while demonstrating barbaric cruelty in others"] with *People v. Zurinaga* (2007) 148 Cal.App.4th 1248, 1260 [finding nonprejudicial misconduct where the prosecutor made an extended comparison of the defendants' robbery and false imprisonment offenses to the hijackings that occurred on September 11, 2001].)

We acknowledge the unique circumstances of the political climate that immediately followed the events of September 11, 2001, and existed at the time of defendant's trial. But while we have advised prosecutors generally to " 'refrain from comparing defendants to historic or fictional villains, especially where the comparisons are wholly inappropriate or unlinked to the evidence,' " we have also held that it is not misconduct for a prosecutor to invoke examples to illustrate a general point about the operation of the law. (*People v. Jones* (1997) 15 Cal.4th 119, 180, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 832, fn. 1; see also *McDermott*, *supra*, 28 Cal.4th at p. 1003.)

Nor do the prosecutor's comments on defendant's recent immigration from Egypt rise to the level of misconduct. The jury had already heard testimony regarding defendant's life in Egypt and about his immigration to the United States. In context it is clear that the prosecutor was not referring to defendant's immigration from Egypt in an effort to inflame the jury's biases, but instead to minimize the mitigating impact of defendant's lack of criminal history and evidence concerning his mental health.

In any case, given the nature and brevity of the prosecutor's comments, as well as the jury instructions and evidence, we see no reasonable possibility that the prosecutor's comments affected the jury's verdict. (See *People v. Williams* (2010) 49 Cal.4th 405, 467.)

### I. Challenges to California's Death Penalty Scheme under the State and Federal Constitutions and International Law

Defendant raises a number of challenges to California's death penalty scheme. We have repeatedly rejected similar claims in the past, and we do so again here.

First, defendant argues that Penal Code section 190.2 is impermissibly overbroad in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to

51

the United States Constitution.  We disagree.  " '[T]he various special circumstances are not so numerous as to fail to perform the constitutionally required narrowing function, and the special circumstances are not unduly expansive, either on their face or as interpreted by this court.' "  (*Linton*, *supra*, 56 Cal.4th at p. 1214.)  Nor does Penal Code section 190.3, factor (a)'s directive to the jury to consider the "circumstances of the crime" result in the arbitrary and capricious imposition of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  (*Linton*, at p. 1215; *id.* at p. 1214; *Tuilaepa v. California* (1994) 512 U.S. 967, 976 ["[T]his California factor instructs the jury to consider a relevant subject matter and does so in understandable terms.  The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence."].)

Defendant also takes issue with the burden of proof at the penalty phase. "Neither the federal nor the state Constitution requires that the penalty phase jury find beyond a reasonable doubt that aggravating factors outweigh mitigating factors before determining whether or not to impose a death sentence," and the United States Supreme Court's Sixth Amendment jurisprudence, including *Apprendi*, *supra*, 530 U.S. 466, does not demand such a requirement.  (*People v. Parker* (2017) 2 Cal.5th 1184, 1232.)  Moreover, " '[t]he death penalty is not unconstitutional for failing to impose a specific burden of proof as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence.' [Citation.]  Nor is the court required to instruct jurors that there is no burden of proof in the penalty phase."  (*Ibid.*)

Defendant also argues that the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution require juror unanimity as to the aggravating circumstances that warrant the death penalty and as to any findings of prior criminal activity. We have rejected these claims in the past, and we decline to revisit those conclusions here. (*People v. Prieto* (2003) 30 Cal.4th 226, 275 [aggravating circumstances]; *People v. Dykes* (2009) 46 Cal.4th 731, 799 (*Dykes*) [prior uncharged criminal activity].)

Defendant also takes issue with the use of CALJIC Nos. 8.85 and 8.88, instructions provided to the jury during the penalty phase. We have previously held that these instructions provide the jury with sufficient guidance for the administration of the death penalty to meet constitutional standards, and we reject defendant's additional arguments that CALJIC No. 8.88 is constitutionally deficient. (*People v. Jones* (2012) 54 Cal.4th 1, 78–79, 87.) First, the phrase "so substantial" is not impermissibly vague or ambiguous, as defendant contends; rather, "the pattern instruction 'properly instructs the jury on its sentencing discretion and the nature of its deliberative process.' " (*Dykes*, *supra*, 46 Cal.4th at p. 816.) Second, defendant's claim that CALJIC No. 8.88 is constitutionally deficient because it fails to direct the jury to determine whether the death penalty is " 'appropriate,' " rather than " 'warrant[ed],' " is meritless. (*People v. Rogers*

(2009) 46 Cal.4th 1136, 1179.)  Similarly, we reject the claim, as we have in the past, that the instruction should specify that a life sentence is mandatory if the jury finds that the factors in mitigation outweigh the factors in aggravation.  (*People v. Parson* (2008) 44 Cal.4th 332, 371.)  The instruction is not deficient for failing to specify that defendant had no burden of proof with respect to the circumstances in mitigation.  (*Ibid.*)  Nor is it deficient for failing to inform the jury that there was no need for unanimity as to those circumstances; such specific instructions are not required under the Sixth, Eighth, or Fourteenth Amendments to the United States Constitution.  Finally, "[t]he trial court's failure to instruct the jury on the presumption of life did not violate defendant's constitutional rights to due process, to be free from cruel and unusual punishment, to a reliable determination of his sentence, and to equal protections of the laws."  (*Parson*, at p. 371.)

Next, defendant argues that the jury's failure to make written findings during the penalty phase of trial violates his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and deprives him of his right to meaningful appellate review.  This claim is meritless.  (*People v. Johnson* (2016) 62 Cal.4th 600, 656.)

Defendant also contends the trial court should have deleted any inapplicable sentencing factors from the instructions, and its failure to do so likely confused the jury, impeding their ability to reach a reliable penalty determination and violating his constitutional rights.  We disagree.  (*People v. Burney* (2009) 47 Cal.4th 203, 261.)

Defendant urges that the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution require courts to engage in intercase proportionality review in order to guard against arbitrary, unreviewable decisions or violations of equal protection or due process. The United States Constitution does not compel such review. (*People v. Jones*, *supra*, 54 Cal.4th at p. 87.) Nor does California's capital sentencing scheme violate the Fifth and Fourteenth Amendments' equal protection guarantees. Rather, "[b]ecause capital defendants are not similarly situated to noncapital defendants, California does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants that are not provided to capital defendants." (*Jones*, at p. 87.)

Finally, we have previously rejected the argument that California's use of the death penalty violates international law, the Eighth and Fourteenth Amendments, or evolving standards of decency, and we decline to revisit those conclusions here. (*Linton*, *supra*, 56 Cal.4th at p. 1217.)

### J. Cumulative Error

Defendant urges that, even if each error he has asserted was harmless, they were cumulatively prejudicial. We have found no errors to cumulate and thus no possible cumulative prejudice that would have denied defendant a fair trial.

## III. Disposition

The judgment is affirmed.

**KRUGER, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**BUTZ, J.**\*

---

\*      Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Ghobrial

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S105908
**Date Filed:** June 21, 2018

_____

**Court:** Superior
**County:** Orange
**Judge:** John J. Ryan

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Denise Anton and Anne W. Lackey, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Anne W. Lackey
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607
(510) 267-3300

Collette C. Cavalier
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 738-9201