Filed 9/7/22  P. v. Gonzalezavila CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060499 |
| v. | (Super. Ct. No. 17NF2778) |
| ENRIQUE GONZALEZAVILA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Lance Jensen, Judge.  Affirmed.

David W. Beaudreau, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Juliet W. Park, Deputy Attorneys General, for Plaintiff and Respondent.

Enrique Gonzalezavila appeals from a judgment after a jury convicted him of committing lewd acts on his daughter and three nieces. Gonzalezavila argues the trial court erred in admitting evidence and instructing the jury, there was cumulative error, and the abstract of judgment must be corrected. We agree the abstract must be corrected. We affirm the judgment.

FACTS

Gonzalezavila committed numerous sexual offenses against his daughter and three nieces from about 2001 to about 2014. He committed these offenses from the time they were about 5 years old to 15 years old.

An information charged Gonzalezavila with the following: E.T.—lewd act upon a child under 14 years of age (Pen. Code, § 288, subd. (a), all further statutory references are to the Penal Code, unless otherwise indicated; count 1), sexual penetration with a child under 10 years of age (§ 288.7, subd. (b); count 2), oral copulation with a child under 10 years of age (§ 288.7, subd. (b); count 3), and aggravated rape of a child under 14 years of age (§ 269, subd. (a)(1); count 4); A.J.—lewd act upon a child under 14 years of age (§ 288, subd. (a); counts 5 & 7) and aggravated rape of a child under 14 years of age (§ 269, subd. (a)(1); count 6); V.T.—lewd act upon a child under 14 years of age (§ 288, subd. (a); count 8), aggravated rape of a child under 14 years of age (§ 269, subd. (a)(1); counts 9 & 10), and aggravated oral copulation upon a child under 14 years of age (§ 269, subd. (a)(4); count 11); and A.G.—lewd act upon a child under 14 years of age (§ 288, subd. (a); counts 12 & 13), sexual intercourse with a child under 10 years of age (§ 288.7, subd. (a); count 14), and oral copulation with a child under 10 years of age (§ 288.7, subd. (b); count 15). As to counts 1, 5, 7, 8, 12, and 13, the information alleged Gonzalezavila committed an offense against more than one victim (§ 667.61, subds. (b) & (e)(5)).

2

*A. Prosecution Case*

*1. Background*

Gonzalezavila married Mariana E. (Mariana) in 1993 and they had A.G. and two sons. Mariana's sister, Veronica E. (Veronica), had A.J., V.T., and E.T. Veronica later married Julio V. and they had two children. They all lived in the same apartment complex. Gonzalezavila loaned Veronica money for rent and food and she would pay him back.

Gonzalezavila, Mariana, and A.G. lived in an upstairs unit. Veronica, Julio, and their children lived downstairs. Gonzalezavila was the apartment manager and had keys to all the units. He would let himself into Veronica's apartment "all the time" and without permission. While Mariana, Veronica, and Julio worked, Gonzalezavila would babysit the children.

Gonzalezavila was very controlling of Mariana. He did not like Mariana visiting anyone, including Veronica. He was strict with A.G. and monitored and limited the time she spent with her cousins.

*2. E.T.—Counts 1-4*

E.T. was born in 2000 and was 20 years old at the time of trial. Gonzalezavila began molesting E.T. when she was about six or seven years old. On the first occasion, he was babysitting her when he asked her to go into his bedroom with him and he locked the door. Gonzalezavila made E.T. rub Vaseline onto his penis. She did not remember if he ejaculated. She did not tell anyone because she was scared and embarrassed.

When E.T. was around eight years old, Gonzalezavila inserted his fingers into her vagina and rubbed his penis on her vagina. He moaned and wanted E.T. to moan, but she refused.

On another occasion, Gonzalezavila tried to help E.T. out of the car and he grabbed her vagina and squeezed it. V.T. saw this and told E.T. to stay away from him.

3

He would make E.T. watch videos of him masturbating until he ejaculated. Afterwards, he would ask her what happened to make sure she had watched it.

When E.T. was around eight or nine years old, Gonzalezavila made her and A.G. draw his penis several times as he stood naked. They drew his penis with crayons. He wanted to see who drew it better and got mad if they did not draw it to his "standards."

When E.T. was nine years old, Gonzalezavila eventually had her perform oral sex on him—this happened several times. He would make E.T. open her mouth, grab her head, pull it by her hair, and push her head onto him. He told her "'[Y]ou have to suck it and you have to suck it right. It is like you are eating a lollipop.'" E.T. told him it was "nasty" and she did not want to do it, but he forced her to do it for a couple of seconds.

When E.T. was 12 years old, Gonzalezavila had sexual intercourse with her. He tried to make E.T. watch a pornographic video to show her it was normal to give oral sex but decided that "[she] would like it better" if they did it themselves. He ripped her pants down so hard the button on her waistband fell off. He pushed her over to the bed, rubbed his penis on her vagina for a couple of minutes, and said, "'You are going to like this.'" He forcefully shoved his penis into her vagina. E.T. was in pain and wanted to cry. She went home and went into the bathroom where she saw blood in her underwear.

Throughout elementary and junior high school, Gonzalezavila abused E.T. three or four times a week. She was scared of him because he was mad often. He stopped molesting E.T. when she turned 14 years old because she moved to Mexico with her mother. She returned a year later, and he no longer let her visit with or talk to A.G.

E.T. and A.G. eventually became close. One day, E.T. asked A.G. if she remembered Gonzalezavila making them draw something. A.G. was surprised E.T.

4

remembered, and they talked about it briefly. E.T. did not disclose what Gonzalezavila did to her for about two weeks, which we discuss anon.

*3. A.J.—Counts 5-7*

A.J. was born in 1992 and was 28 years old at the time of trial. Gonzalezavila started molesting A.J. when she was around seven to nine years old.

When A.J. was in elementary school, A.J. was sitting in the car's front seat and Gonzalezavila was sitting in the backseat. He told her to look in the rearview mirror. She saw him masturbating. One day at home, he called her upstairs and had her watch him masturbate. He had her help him masturbate but told her she was doing it too slow. Throughout elementary and junior high school, he made her touch his penis weekly.

On another occasion, Gonzalezavila and A.J. were on the bed together. He touched her breasts and the outside of her vagina with his hands. She could not remember how many times he did this but it was more than once.

When A.J. was about 11 years old, she and Gonzalezavila were in her bedroom. He told her to get on her knees and he poured baby oil on her back. He pushed his penis against her vagina and tried to put it inside of her. He penetrated her slightly. When she told him it hurt, he said to look forward and not to think about it. She pushed him away, but he tried to penetrate her several more times. Unsuccessful, he told her that she needed to find a boy her age because it would be "smaller" and "easier."

Growing up, Gonzalezavila yelled at A.J. and she was afraid of him. A.J. complied with Gonzalezavila's demands because he told her that he would do the same things to V.T. if she did not listen. A.J. thought she was protecting V.T. and E.T. She did not tell her mother because she was embarrassed. He stopped molesting her when she was in junior high school.

*4. V.T.—Counts 5-7*

V.T. was born in 1995 and was 25 years old at the time of trial. Gonzalezavila started molesting V.T. when she was five years old. He would grab her

hand and touch his penis, touch her vaginal area, digitally penetrate her, and rub his penis on her vaginal area. He would also make her lay down next to him, touch her all over her body, put his penis in her face, and make her give him oral sex. If she did not give him oral sex, he would threaten to cut her. He once tried putting his mouth on her vagina, but she kicked him in the face.

When V.T. was six or seven years old, Gonzalezavila went into her bedroom after she had taken a shower, threw her on the bed, and took off her towel. He touched her chest and put his fingers into her vagina. He put his penis into her vagina. V.T. was in pain and she was crying and screaming. He told her to be quiet and covered her mouth. When he was done, he saw blood on the sheets and grinned. He told her to not say anything and he was sorry.

Several weeks or months later, V.T. was at Gonzalezavila's apartment with him and his friends. He touched her breasts and tried to digitally penetrate her. He allowed his friends to touch her.

When V.T. was nine years old, Gonzalezavila took off her clothes and put his penis inside her vagina. He got mad because she was crying and yelling. He slapped her and told her to be quiet. When he saw blood, he smiled.

V.T. saw Gonzalezavila take A.J. away several times. When A.J. returned, she looked sad, her eyes were watery, and she would sit in the corner scratching herself. She saw A.J. giving Gonzalezavila oral sex, and she saw him grab E.T.'s vagina when he helped her get out of a car.

V.T. listened to Gonzalezavila or he would get angry. He would pinch her, threatened to molest her sisters, and stop lending her parents money. When she refused his advances, he charged her parents interest. He also gave her something that made her feel dizzy. She saw him give alcohol to A.J. When she went to check on A.J., she saw her laying on the floor unconscious with her shirt undone.

6

Gonzalezavila stopped molesting her when she was 15 years old, on her birthday. At her birthday party, he pulled her away and put his hands inside of her vagina, touched her breasts, and put his penis inside her vagina.

*5. A.G.—Counts 12-15*

A.G. was born in 1998 and was 22 years old at the time of trial. Gonzalezavila started molesting his daughter when she was about seven years old. He would enter her bedroom, lay next to her in her bed, and touch the outside of her vagina under her clothes with his fingers.

When A.G. was eight years old, Gonzalezavila put his mouth on her vagina. When she was nine or 10 years old, he made her touch his penis and masturbate him to ejaculation. When she was about 11 or 12 years old, he would make her perform oral sex on him.

When A.G. was nine years old, Gonzalezavila had sexual intercourse with her. When he put his penis inside of her vagina, she yelled and said that it hurt. Gonzalezavila stopped molesting his daughter when she was in junior high school.

A.G. never told anybody because she was scared of her father. She was also afraid she would lose her siblings and mother if people found out about the abuse. On one occasion, Gonzalezavila apologized to her after molesting her which confused her.

When A.G. was about nine years old and E.T. was seven or eight years old, Gonzalezavila made them play with his penis and draw it. He wanted to see who drew it best. They did not discuss the incident until years later.

Around January 2017, E.T. contacted A.G. and asked whether she remembered Gonzalezavila made them draw his penis.[1] A.G. said she remembered the incident, but she did not think E.T. would remember because it happened a long time ago.

---

[1] E.T. said it was later in 2017.

*6. The Victims' Disclosure*

Sometime after E.T. and A.G. spoke, E.T. told A.G. that she wanted to tell someone about the drawing incident. A.G. encouraged her to do so. A.G. did not know Gonzalezavila molested E.T. on other occasions.

E.T. told Veronica that Gonzalezavila had been touching her for a while and he "put it inside of [her] once." E.T. did not reveal details because she was crying and embarrassed. Veronica had never seen Gonzalezavila do anything to her daughters, although she would come home and find him in her apartment unexpectedly. On one occasion, she saw him give alcohol to one of her daughters. E.T. testified she had never accused anyone else of touching her and Gonzalezavila was the only person that had ever touched her in this manner.[2]

V.T. and A.J. disclosed to Veronica that Gonzalezavila also molested them. E.T., V.T., and A.J. did not reveal details with Veronica or each other. Before that day, none of them knew Gonzalezavila molested all of them. When A.J. found out, she was surprised, disappointed, and felt "like trash because [she] would do stuff so he wouldn't touch [V.T.]" Veronica testified none of her daughters accused anyone of molestation other than Gonzalezavila.

Veronica called Mariana the night she learned Gonzalezavila molested her daughters. Mariana talked to A.G., who only said Gonzalezavila had touched her and put it in once. A.G. refused her mother's request for additional details. Mariana had no idea Gonzalezavila had been molesting her daughter or her nieces. A.G. had no idea he

---

[2]       During A.G.'s cross-examination, counsel elicited testimony E.T. had accused three people of sexually abusing her: Gonzalezavila, Julio, and her mother's ex-boyfriend. On redirect examination, A.G. testified she subsequently learned E.T. had accused the others because E.T. felt bad singling out Gonzalezavila.

molested her three cousins until after E.T. disclosed it to Veronica. Veronica and her three daughters did not know he had also abused A.G. until that day.

Soon after, Gonzalezavila learned about the allegations and told A.J. not to say anything. When Mariana confronted Gonzalezavila, he denied the accusations but also said, "'Please forgive me. I really hurt them.'"

It took the victims time to report Gonzalezavila to the police because everyone had different feelings. They ultimately decided to report him because they feared he would hurt someone else in their family.

Sometime in 2017, Mariana, Veronica, E.T., , and A.J. went to the police station together. A.G. eventually went as well.

At the police station, Officer Eric Carrillo interviewed E.T. and A.J. Officer Jose Ruelas interviewed V.T. A.J. did not tell Carrillo everything because she was embarrassed. V.T. did not share much with Ruelas because he interviewed her in a busy hallway. A few days later, Detective Cynthia Hines interviewed each victim in their homes. The victims' statements to Carrillo, Ruelas, and Hines are at issue in this appeal and discussed more fully below.

*7. Hines's Interview of Gonzalezavila*

On October 5, 2017, Hines interviewed Gonzalezavila at the police station; the interview was recorded and played for the jury. Gonzalezavila claimed the victims falsely accused him, and he repeatedly denied the allegations. He said E.T. first accused Julio and him of touching her. The next day, E.T. said she lied about Julio but claimed Gonzalezavila raped her. Emilia told him that she only brought up Julio to bring up the allegations against Gonzalezavila. Gonzalezavila eventually admitted to molesting E.T. when she was seven, A.J. when she was younger than 10, and A.G. when she was eight. He admitted touching E.T.'s vagina with his hand on two occasions, but he denied putting his finger inside. He also admitted touching A.J. but denied putting his penis

9

inside her mouth. He asked his daughter for forgiveness and admitted he "fucked up." He denied ever touching V.T.

### 8. Child Sexual Abuse Accommodation Syndrome (CSAAS)

Dr. Jody Ward, a clinical forensic psychologist, testified about CSAAS; she had no knowledge about the facts of the case. She described CSAAS as a pattern of behaviors displayed by many children who have been sexually abused. She testified CSAAS cannot be used as a tool to diagnose whether sexual abuse occurred, but it helps explain children's "counterintuitive" behaviors in response to sexual abuse. Ward stated CSAAS has five stages: secrecy, helplessness, entrapment, delayed unconvincing disclosure, and recantation. She said that while the secrecy and helplessness components are present in every case of child sexual abuse, the other components may or may not be present depending on each situation.

### B. Defense Case & Closing Argument

Gonzalezavila did not present any witnesses. During closing argument, his trial counsel acknowledged he admitted to touching E.T., A.J., and A.G. Counsel thus conceded guilt on counts 1, 5, 7, and 13. However, he requested the jury find Gonzalezavila not guilty on the remaining counts because he "denied any sort of penetration, oral copulation, [and] anything in excess of the touching."

The jury convicted Gonzalezavila of all counts except count 9. On that count, it convicted him of the lesser included offense of misdemeanor simple assault. The trial court sentenced Gonzalezavila to prison for 190 years to life.

### DISCUSSION

### I. Prior Consistent Statements

Gonzalezavila argues the trial court prejudicially erred by admitting E.T.'s, A.J.'s, V.T.'s, and A.G.'s prior consistent statements to Carrillo, Ruelas, and Hines because Evidence Code section 791's requirements were not satisfied. As we explain below, Gonzalezavila was not prejudiced by any error.

10

*A. Background*

*1. E.T.*

On direct examination, E.T. testified Gonzalezavila started molesting her when she was about six years old and he had her put Vaseline on his penis. On cross-examination, counsel elicited testimony E.T. told Carrillo she was seven years old and she did not mention Vaseline. Additionally, on redirect examination, E.T. testified she never accused "anyone else" of molesting her and Gonzalezavila was the only person to do so. On cross-examination, A.G. testified E.T. told her three men had abused her— Gonzalezavila, Julio, and her mother's ex-boyfriend.

The prosecutor questioned Carrillo and Hines about their interviews with E.T. When the prosecutor asked Carrillo whether E.T. told him that Gonzalezavila made her touch his penis, counsel objected it was leading and hearsay. The trial court asked the prosecutor to respond. When she said prior consistent statement, the court overruled the objection. The court overruled two more hearsay objections.

Although Ruelas interviewed V.T., not E.T., this issue arose again during his testimony. During a chambers conference, the trial court asked the prosecutor to articulate the applicable hearsay exception. She said prior consistent statements. The court responded it wanted to develop "a clear record." The court asked counsel whether he "want[ed] to run the objection." When counsel replied, "I do want an ongoing objection," the court asked, "On the grounds you've stated?" Counsel responded affirmatively, and the court said, "All right. So noted. Objection's overruled." Testimony resumed.

When the prosecutor questioned Hines about E.T.'s statements, counsel objected on hearsay grounds. The court repeated counsel could lodge a continuing objection. Counsel responded, "Sure."

11

*2. A.J.*

On direct examination, A.J. testified Gonzalezavila penetrated her "[s]lightly, but not all." On cross-examination, counsel elicited testimony A.J. failed to mention penetration when she spoke to Veronica, Carrillo, and Hines. She conceded she did not "remember being that specific." Additionally, on direct examination, A.J. described an episode during which Gonzalezavila masturbated in front of A.J. and her friend inside a car. However, when the police investigated the car incident shortly after it occurred, sometime before 2000, A.J. denied anything improper took place. She lied about the incident to the police, Veronica, and her friend's mother. The prosecutor questioned Carrillo about his interviews with A.J.

*3. V.T.*

On direct examination, V.T. testified she was nine years old when Gonzalezavila had sex with her the second time. On cross-examination, V.T. testified he penetrated her twice, once when she was six or seven years old and the second time a couple months later. The prosecutor questioned Ruelas and Hines about their interviews with E.T.

*4. A.G.*

On direct examination, Mariana testified she left Gonzalezavila in February 2017 because she learned he had cheated on her. On cross-examination, she testified she learned of the infidelity before E.T. and A.G. accused Gonzalezavila of molesting them. The prosecutor questioned Hines about her interview with A.G.

*B. Law & Analysis*

Evidence Code section 1236 sets forth the hearsay exception for prior consistent statements. It states, "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with [the witness's] testimony at the hearing and is offered in compliance with [Evidence Code] [s]ection 791." Evidence Code section 791 permits the introduction of a witness's prior

12

consistent statement if (1) the court has admitted evidence of an inconsistent statement for the purpose of attacking the witness's credibility, or (2) "[a]n express or implied charge has been made that [the witness's] testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Evidence Code section 353 requires a party to object to the admission of evidence to preserve the issue for appellate review. Although a comment to that section authorizes the use of a continuing objection (Evid. Code, § 353, Comment, par. (2)), it is not always the best practice when evidence could be admissible under different provisions as is the case with Evidence Code section 791. Here, the trial court overruled Gonzalezavila's hearsay objections to Carrillo's, Ruelas's, and Hines's testimony concerning the victims' statements. But the trial court did not provide its reasoning on the record as to the admissibility of those statements. The better practice would be to require counsel to offer its theory of inadmissibility and the trial court to state reasons on the record for its ruling. Otherwise, an appellate court is left to guess as to the trial court's reasons for its evidentiary ruling.

The trial court's failure here to develop a complete record is of no consequence as Gonzalezavila was not prejudiced by any error. We review the application of the ordinary rules of evidence for harmless error under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. McNeal* (2009) 46 Cal.4th 1183, 1188, 1190, 1203.)

Here, any prejudice from admitting the evidence was minimal. The police interviews were mostly cumulative to the victims' lengthy testimonies, which were properly admitted and subject to cross-examination. The erroneous admission of evidence is ordinarily not prejudicial when it is cumulative to other properly admitted evidence. (*People v. Blacksher* (2011) 52 Cal.4th 769, 818, fn. 29 [assuming admission of hearsay statements was erroneous, their "admission could not have been prejudicial by

13

any standard because they were identical to [other statements properly admitted], and were therefore cumulative"].)

Gonzalezavila's primary complaint is the police interviews bolstered the victims' credibility. Although the statements had some tendency to bolster the victims' credibility, the statements also had some tendency to undermine their credibility. Indeed, during closing argument, Gonzalezavila's trial counsel attacked the victims' credibility as a result of the inconsistencies in the victims' statements. Therefore, the effect of the evidence as to the victims' credibility stood in relative equipoise.

Most importantly, the error was harmless because the evidence of Gonzalezavila's guilt was overwhelming. (*People v. Beltran* (2013) 56 Cal.4th 935, 956 [in determining whether an error was harmless under *Watson*, "'an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result'"].)

Even though the offenses occurred between seven and 20 years before trial, each of the victims provided detailed, vivid, and convincing testimony regarding the numerous molestations Gonzalezavila committed against them. The victims' comprehensive testimonies alone were sufficient to support his convictions. (*People v. Ghobrial* (2018) 5 Cal.5th 250, 281 [testimony of single witness sufficient to support conviction unless testimony physically impossible or inherently improbable].) Although there were some discrepancies and inconsistencies in their testimonies, they were not physically impossible or inherently improbable. (*Ibid*.) Additionally, Gonzalezavila's statements to his family and Hines, and his admissions helped establish his guilt.

Finally, any error in admitting the evidence did not violate Gonzalezavila's constitutional rights. (*People v. Nelson* (2016) 1 Cal.5th 513, 537 [application of

14

ordinary rules of evidence does not violate defendant's constitutional rights].)  Based on this record, Gonzalezavila was not prejudiced by an error.

## II.  Jury Instructions

### A.  CALCRIM No. 1193

Gonzalezavila contends the trial court erred by instructing the jury with CALCRIM No. 1193 because it misstated the law and violated his federal constitutional rights.  We disagree.[3]

Gonzalezavila concedes several courts have held the instruction is proper. (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 175-176; *People v. Munch* (2020) 52 Cal.App.5th 464, 473-474 (*Munch*); *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504 (*Gonzales*).)  He acknowledges CALCRIM No. 1193 states CSAAS evidence "is not evidence that the defendant committed" the charged crimes.  Nevertheless, he claims the instruction allows the jury to "evaluat[e] the believability of [alleged victims'] testimony."  We reject this argument for the reasons stated in *Gonzales* and *Munch*. (*Munch, supra,* 52 Cal.App.5th at p. 474; *Gonzales, supra,* 16 Cal.App.5th at p. 504.) Gonzalezavila offers us no compelling justification to depart from this well-reasoned authority, and we follow it here.

Finally, Gonzalezavila asks us to interpret CALCRIM No. 1193 by referring to its predecessor, CALJIC No. 10.64.  This we cannot do.  The omission of additional language that was included in CALJIC No. 10.64 was immaterial.  The trial court fully instructed the jury on the presumption of innocence and the prosecution's burden of proof.  CALCRIM No. 1193 informed the jury of the proper uses of the evidence, the only essential information required.  Thus, the trial court did not err in instructing the jury with CALCRIM No. 1193.

---

[3]  Although Gonzalezavila did not object to this instruction at trial, we address the merits.  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087 [argument that jury instruction misstated the law not forfeited despite failure to object at trial].)

*B. CALCRIM No. 1191B*

Gonzalezavila asserts the trial court erred by instructing the jury with CALCRIM No. 1191B. He acknowledges though *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159 [CALCRIM No. 1191 proper], precludes his claim and raises it to preserve it for further review. Assuming the issue is not forfeited, we agree *Villatoro* bars his claim and accept his concession. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *People v. Meneses* (2019) 41 Cal.App.5th 63, 67-68 [CALCRIM No. 1191B proper under *Villatoro*].)

*III. Cumulative Error*

Gonzalezavila argues the cumulative effect of the errors prejudiced him. We have concluded any evidentiary error was harmless. There were no instructional errors. His cumulative error claim is meritless.

*IV. Abstract of Judgment*

Gonzalezavila contends the abstract of judgment must be corrected to reflect the correct restitution and parole revocation fines. The Attorney General agrees.

As a general rule, a trial court's oral pronouncements are presumed correct. (*People v. Mesa* (1975) 14 Cal.3d 466, 471.) A reviewing court may correct an error in the abstract of judgment on its own motion or upon the request of the parties. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-187.)

Here, at the sentencing hearing, the trial court imposed $200 for each of the restitution and parole revocation fines. The abstract of judgment lists a $300 restitution fine (§ 1202.4, subd. (b)), and a $300 parole revocation fine (§ 1202.45). The abstract of judgment must be corrected to reflect the trial court imposed $200 for each of these fines.

DISPOSITION

The clerk of the superior court is ordered to prepare a new abstract of judgment reflecting the trial court imposed $200 for each of the restitution and parole revocation fines and forward a copy of the corrected abstract of judgment to the

16

Department of Corrections and Rehabilitation, Division of Adult Operations.  The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


GOETHALS, J.


MOTOIKE, J.