Filed 1/14/25  P. v. Martin CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>NORMAN DAVID MARTIN,<br><br>    Defendant and Appellant. | G062661<br><br>(Super. Ct. No. 18HF1669)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge. Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve

Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

*        *        *

After a jury found Norman David Martin guilty of two counts of second degree murder, he was sentenced to 30 years to life. Martin appeals from the trial court's denial of his advisory counsel's request to suspend proceedings and hold a second competency hearing. We conclude he failed to present new evidence or a substantial change in circumstances casting a serious doubt on the validity of the previous finding he was competent to stand trial and represent himself. Accordingly, we affirm.

RELEVANT FACTS

I.

UNDERLYING OFFENSES

Because Martin does not challenge the jury's factual findings, we summarize the trial evidence in light of the jury's verdicts. On July 21, 2017, after being "released" from his job that morning, Martin decided to go out for the night with friends to "blow off some steam." After drinking one or two beers, at around 8:30 p.m., he drove his Corvette to pick up and bring a friend to his apartment. During this trip, Martin drove in excess of 100 miles per hour, causing his friend to advise him to slow down. From Martin's apartment, the two took a ride-share service to a restaurant to meet two other friends.

Later that evening, Martin and his friends took a ride-share service to a lounge, where Martin had at least five alcoholic drinks. When the lounge closed around 1:30 a.m., the group decided to go to a rooftop patio. While waiting for a ride-share vehicle outside the lounge, Martin convinced two women he had met at the lounge to join the group and go to the patio.

2

When the ride-share vehicle arrived, there was not enough room for everyone. Martin told his friends he would call for another ride-share vehicle for himself and the two women and meet them later.

Instead of getting a ride-share to the patio, however, Martin went home. Around 2:13 a.m., he called one of his friends and said they "got the car" and were heading over. His friend expressed concern and stated, "I hope you're not driving." Several minutes later, his friends, who were waiting on the rooftop patio, heard a loud crash from below. They rushed downstairs and observed Martin's Corvette had been involved in a terrible collision.

An accident investigator determined the Corvette had been traveling at 138 miles per hour seconds before it crashed. None of the vehicle's occupants were wearing seatbelts, and all three were ejected from the vehicle. The two women died from blunt force trauma. Martin's blood plasma was tested and showed a blood alcohol content (BAC) of .13 percent, which would convert to a BAC of .11 percent for whole blood. Most people are too impaired to safely operate a motor vehicle when their BAC is between .05 and .09 percent.

## II.

### MARTIN REQUESTS TO SELF-REPRESENT

Martin was initially represented by retained counsel, but on November 6, 2020, he requested that his counsel be relieved and a public defender appointed to represent him. Because Martin then vacillated between appointment of a public defender and seeking to proceed in pro. per., the trial court declined to act on Martin's request to relieve retained counsel, to allow Martin more time to consider.

At the next hearing on November 10, Martin stated he wanted to retain counsel but expressed frustration about the representation. Retained

counsel declared a conflict because Martin refused to follow advice and made clear he distrusted his attorneys. After the trial court relieved counsel, Martin stated he wanted to represent himself. After advising Martin of the risks involved, the court granted the request.

Martin represented himself in several subsequent hearings. At the next hearing on February 19, 2021, an attorney named Dyke Huish appeared and introduced himself as an attorney retained by Martin's family to represent Martin. Martin stated that Huish did not represent him. The prosecutor informed the trial court that Huish had expressed "serious questions and reservations about [Martin's] ability to represent himself." The court trailed the matter to the following week.

## III.

### THE TRIAL COURT DECLARES A DOUBT ABOUT MARTIN'S COMPETENCE

On February 26, Huish argued the trial court should declare a doubt as to Martin's competency based on his diminished mental capacity and his failure to properly represent himself. Huish stated that Martin's father informed him Martin had suffered severe brain or head trauma from the accident and spent numerous weeks in a coma. Although there was no problem with Martin's short- or long-term memory, Martin was suffering problems with what Huish characterized as "middle term" memory. Huish stated: "He's able to comprehend the moment, but then the next time people gather, he repeats the same circumstance." Huish argued it would be improper to allow a person "who continually repeats himself, cannot follow basic instructions from the Court to even obtain the discovery [and] [cannot] even name a witness against him" to represent himself.

The prosecutor stated she "had very serious doubts as well" about Martin's competence to represent himself. The prosecutor noted Martin had

4

sent her a letter "'confirming that [he] will not be calling any witnesses at [his] imminent trial.'" In contrast, Martin's former retained counsel had planned to call "easily" 20 witnesses, including experts, to "rebut various parts of the People's case."

The trial court then considered: (1) Martin's brain injury; (2) Martin's unsolicited "letter writing campaign" to the court;[1] and (3) Martin's apparent desire to commit "legal suicide" by not calling any witnesses. The court declared a doubt as to Martin's competency and suspended criminal proceedings, pursuant to Penal Code section 1368.[2] The prosecutor stated she agreed with the court's decision. The court appointed a public defender (Chuck Hasse) for section 1368 purposes, and the prosecutor and the public defender each selected a doctor to evaluate Martin.

IV.

COMPETENCY PROCEEDINGS

At the next court hearing, the public defender objected to the court's declaration of doubt. He stated he had met with Martin and did not have a doubt as to his competence. The next day, the public defender filed a written motion to dismiss the charges, arguing the trial court had violated Martin's speedy trial rights by declaring a doubt about his competency and suspending proceedings without substantial evidence. The public defender argued there was "no evidence Mr. Martin suffered from a mental condition

---

[1] Previously, while represented by retained counsel, Martin had sent the court up to 15 letters, which the court had not read as it found they were improper ex parte correspondence. Martin later stated the 15 letters were identical except for the cover pages.

[2] All further statutory references are to the Penal Code unless otherwise stated.

that rendered him incapable of understanding the proceedings (clearly, he did understand them), nor was there any reason to believe he was unable to assist counsel, though he made it clear that he wished to represent himself. In fact, he was represented by two attorneys . . . for well over a year without any hint that he was incompetent to stand trial."

In a forensic psychological evaluation dated March 23, 2021, Dr. Robert Flores de Apodaca opined that Martin was competent to stand trial. As detailed in the report, Martin was "cooperative" and "answered all questions posed to him with directness and elaboration." He "was able to engage in a conversational exchange without apparent difficulties with comprehension or expression of language," and "did not report or display clinically significant signs of delusions, hallucinations, or disorganization of thought." Although Martin reported suffering a traumatic brain injury that resulted in the loss of "some 15% of his memory," he "did not evince memory impairments that interfered with his cognitive performance during th[e] interview" with Dr. Flores de Apodaca. The doctor did not need to repeat any of his questions, and Martin's "answers were always lucid, responsive, and relevant." The doctor concluded that "Mr. Martin is able to understand the nature of his legal circumstances and cooperate with his attorney in a rational manner."

In a forensic psychological evaluation report dated March 30, 2021, Dr. Jennifer Bosch opined that Martin was competent to stand trial because "[t]here is no evidence of a mental illness driving Mr. Martin's decision to represent himself." A test designed to evaluate competency to stand trial indicated Martin had "both a factual and rational understanding of the judicial system and has the ability to aid in his defense in a rational manner." Dr. Bosch stated that during her interview, Martin "appear[ed]

6

very comfortable in verbal exchanges and has a large vocabulary which he uses to express himself." "His thoughts were linear, logical and easy to track." Aside from a loss of memory about the accident and the weeks afterwards, "all other memories are intact. Insight and judgment appear intact as well." The doctor noted that Martin was "highly confident that the DNA evidence will exonerate him and that the evidence in general is overwhelming in favor of a Jury finding him innocent."[3] Although Dr. Bosch felt Martin's decision to represent himself was "ill conceived, naïve, and overly confident," she concluded "[t]here is no evidence of a mental illness driving Mr. Martin's decision to represent himself and . . . Mr. Martin is competent to stand trial."

At a hearing on April 2, 2021, the trial court rejected Martin's motion to dismiss. At the next hearing, the court found Martin competent to stand trial, and it reinstated criminal proceedings.

Citing *Indiana v. Edwards* (2008) 554 U.S. 164, the trial court expressed concern about whether Martin was a "'gray area defendant'" who was competent to stand trial but incompetent for self-representation. Eventually, after questioning Martin and hearing argument from the public defender, the court revoked Martin's pro. per. status because of Martin's "memory impairment." It then appointed the public defender to represent him.

On May 18, the public defender (Alisha Montoro) asked the trial court to reconsider its ruling on Martin's self-representation. After further discussion, the court stated it would "appoint the same doctors to do a

---

[3] The DNA evidence would exonerate him if it showed he was not the driver at the time of the tragic crash.

supplemental [report], only [on Martin's] competency to represent himself for purposes of present memory ability."

In a memory screening report dated June 8, 2021, Dr. Flores de Apodaca opined, after administering a memory assessment test that, consistent with Martin's traumatic brain injury, his "memory functioning is substantially below average across the board; verbal and visual, with verbal memory substantially more limited than visual." In contrast, in an updated forensic psychological evaluation dated June 15, 2021, Dr. Bosch opined, after administering a series of neurocognitive tests, that Martin's overall memory functioning was "in the normal to the superior range with no indication whatsoever of impairments in the overall memory functioning."

Subsequently, on June 17, after explaining again the dangers of self-representation, the trial court relieved the public defender and reinstated Martin's pro. per. status.

V.

TRIAL PROCEEDINGS

On July 2, 2021, before trial, Martin waived his right to be dressed in civilian clothes and elected to wear jail clothing.

On July 21, during voir dire, Martin successfully challenged two prospective jurors for cause.

On July 26, after the People's opening statement, Martin chose to reserve his opening statement. During trial, Martin chose not to examine the prosecutor's witnesses. Martin would state, "I have no questions, comments, or concerns." He also would thank the witnesses for their service.

The same day, Martin's investigator requested to be relieved, explaining that Martin had failed to secure additional funding. Martin stated he did not request additional funds for the investigator because "I'm very

8

confident in the strategy I've devised for this, and I do not believe that I need an investigator. Though [the investigator] has been absolutely brilliant, I cannot commend him enough, I do not believe that he is an essential part to my defense." The trial court then relieved the investigator.

After a recess, the trial court asked Martin whether his decisions to forgo an opening statement and refrain from questioning the People's witnesses were based on "a feeling that you may have that you weren't allowed to do so." Martin responded, he "did not have that feeling" and it was a "conscious choice."

The next day, on July 27, while the prosecutor was questioning a witness, Martin had an outburst. He stated the media and the Federal Bureau of Investigation (FBI) should be contacted; that "President Trump was behind this"; and that he loved his father. After the jury exited the courtroom, Martin asked the judge to contact the media. The trial court noted Martin had conducted himself "as a gentleman up until now" and explained there would be a five- to ten-minute recess before Martin would be brought back to converse with the court. Martin asked for a "shark gizmo, which is a little device that goes into the ocean," and "solar panels." The court told Martin he was being disruptive and ordered him removed from the courtroom.

After the recess, the trial court told Martin he had always maintained "the decorum necessary to proceed in this case" but that something happened that ended with the outburst before the jury. The court stated it would not ask what caused "this change in demeanor but it wanted to know": "[I]s it going to be the Mr. Martin from yesterday when we come back [with the jury], or is it going to be the Mr. Martin that had the outbreak in front of the jury . . . ?" Martin answered: "I've prayed to God, of whom we

9

trust, that the seed was correctly planted. But from this time forth, I will go back to my demeanor as I have exercised my entire life with the exception of the last 30 minutes." The court immediately noted its concern about Martin's statement that "the seed has been planted," and it stated the jury would be admonished to not consider the outburst. After further questioning, Martin gave his word that he would not have another outburst. There were no further outbursts.

On July 28, the People put on evidence detailing how the victims died, including showing "graphic photos" to the witnesses. Although the jury did not see the photos, Martin saw them. The following day, the trial court was informed that Martin had tried to commit suicide the prior evening. The court ordered a section 4011.6 mental health evaluation and set the next court hearing for August 2.[4] Without revoking Martin's pro. per. privileges, it also appointed the public defender to temporarily represent him.

## VI.

### DENIAL OF SECOND COMPETENCY HEARING

On August 2, 2021, Martin was not present but was represented by public defender Montoro. The trial court stated that it was in possession of a section 4011.6 report, which stated Martin "does not currently present a major mental illness/disorder." The public defender informed the court she

[4] Section 4011.6, subdivision (a), provides: "If it appears . . . to any judge of a court in the county in which the jail . . . is located, that a person in custody in that jail . . . may have a mental health disorder, that . . . judge may cause the prisoner to be taken to a facility for 72-hour treatment and evaluation pursuant to Section 5150 of the Welfare and Institutions Code and shall inform the facility in writing, which shall be confidential, of the reasons that the person is being taken to the facility. The local mental health director or the director's designee may examine the prisoner prior to transfer to a facility for treatment and evaluation."

had a doubt as to Martin's competence based on his trial defense, e.g., "He gave no opening statement, cross-examined no witnesses, made no objections, and has indicated he intends to present no evidence." The prosecutor noted the prior competency finding and argued that "merely having a poor strategy or being a bad lawyer on one's own behalf wouldn't necessarily indicate a failure or an inability to have the qualities necessary to represent one's self." The court decided the most prudent course was to continue the matter until Friday, August 6, and conduct another section 4011.6 examination.

On August 6, Martin was present and represented by the public defender as an advisory counsel. Martin had been examined twice since August 2, and both section 4011.6 reports stated he "[d]oes not currently present a major mental illness/disorder." The public defender continued to declare a doubt as to Martin's competence and requested the trial court suspend proceedings for a neuropsychologist to conduct a full evaluation. The trial court decided to defer a ruling on Martin's competency until the next hearing on Monday.

On Monday, August 9, Martin was present and still represented by the public defender. The trial court had been provided with a fourth section 4011.6 report, which again stated Martin did not present as having a major mental illness or disorder. After hearing additional argument and reviewing the case history, the court concluded there was no doubt as to Martin's competency to stand trial. It based its conclusion on: (1) the four section 4011.6 reports, which all concluded Martin did not present as having a major mental illness or disorder; (2) the public defender's prior strong position that Martin did not have a mental illness; (3) the court's observations during trial; and (4) Martin's comment about planting the "seed" shortly after his singular outburst.

11

The trial court then examined whether Martin was competent to represent himself. When asked for an explanation of changed circumstances, the public defender argued that previously Martin was not suicidal and had a strategy of presenting forensic and circumstantial evidence showing he was not driving the Corvette, but that subsequent trial proceedings showed Martin did nothing to implement his defense strategy. The public defender requested the court find Martin incapable of representing himself and declare a mistrial. After further argument by the parties and following a recess during which the court reviewed the record, the court concluded it did not have "a reasonable doubt about Mr. Martin's ability to represent himself based upon the strategy that Mr. Martin undertook." The court noted that all involved parties had repeatedly advised Martin it would be a bad idea to represent himself. It noted that, except for the singular outburst, Martin's demeanor and behavior was "professional" and "deferential." The reports all stated Martin did not suffer from a present major mental illness or disorder. The court then discussed certain troublesome incidents. As to Martin's decision to wear jail clothing, the court recounted it asked Martin and he responded, "'Well, I think it's best that I be in the [jail] attire.'" As to the singular outburst, the court concluded it was a "premeditated deliberate decision" based on Martin's comment that he "'planted the seed.'" As for the suicide attempt, it was "very sad," but not grounds to revoke pro. per. status. In sum, the court concluded no mental disorder rendered Martin incapable of representing himself.

The public defender requested to delay trial for a neuropsychologist to evaluate Martin, which the court denied. The trial then continued the next day.

12

## VII.

### FURTHER TRIAL PROCEEDINGS

Aside from a previously noticed witness, the prosecutor stated he would call several witnesses to discuss the DNA found on the driver's side and the passenger's side of the Corvette. The prosecutor explained he "want[ed] to make clear we are being as fair as possible" by putting on DNA evidence, "which supports the defense theory, warts and all." The trial court asked Martin whether he was objecting to the new witnesses. Martin replied he had no objection and stated it would be "just."

Martin did not cross-examine any of the witnesses and thanked several of them. He also did not object to the prosecution's trial exhibits. When asked whether he would call any witnesses, Martin stated he would not. After being advised of his right to remain silent or to testify, Martin elected to not testify. He also declined to comment on the prosecutor's proposed jury instructions and did not offer any instructions of his own. Martin also declined to give a closing argument to the jury.

After deliberations, the jury returned guilty verdicts on two counts of second degree murder. At the sentencing hearing, Martin requested the appointment of a public defender. The prosecutor objected on the basis that the request was untimely because the victim's family members were present to give victim impact statements. The prosecutor asserted that had the request been made "even a month or week or day before, we would not be objecting." The trial court granted the request and appointed the public defender.

Eventually, Martin was sentenced to a total term of 30 years to life. He then appealed.

13

# DISCUSSION

## I.

### COMPETENCY HEARINGS

"The due process clause of the federal Constitution's Fourteenth Amendment prohibits trying a criminal defendant who is mentally incompetent." (*People v. Ary* (2011) 51 Cal.4th 510, 517 (*Ary*).) "A defendant is deemed competent to stand trial only if he '"has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding"' and '"has a rational as well as factual understanding of the proceedings against him."'" (*Ibid.*, quoting *Dusky v. United States* (1960) 362 U.S. 402, 402.) "When a trial court is presented with evidence that raises a reasonable doubt about a defendant's mental competence to stand trial, federal due process principles require that trial proceedings be suspended and a hearing be held to determine the defendant's competence. [Citations.] Only upon a determination that the defendant is mentally competent may the matter proceed to trial." (*Ary*, at p. 517.)

"California law reflects those constitutional requirements. Section 1368, in subdivision (a), requires a trial court to suspend criminal proceedings at any time 'prior to judgment' if the court reasonably doubts 'the mental competence of the defendant.' A defendant can create reasonable doubt through substantial evidence of mental incompetence, or the trial court can raise the issue on its own." (*Ary, supra,* 51 Cal.4th at p. 517.) "'[M]ore is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such

14

diagnosis with little reference to defendant's ability to assist in his own defense [citation].'" (*People v. Ghobrial* (2018) 5 Cal.5th 250, 270 (*Ghobrial*).)

If a defendant has been found competent to stand trial, "a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding." (*People v. Jones* (1991) 53 Cal.3d 1115, 1153 (*Jones*).) A substantial change of circumstances or new evidence casts a serious doubt on the validity of the prior finding if it "ma[kes] it unreasonable [for the trial court] to continue to rely on the prior competence finding . . . ." (*People v. Rodas* (2018) 6 Cal.5th 219, 235 (*Rodas*).) However, "the duty to suspend is not triggered by information that substantially duplicates evidence already considered at an earlier, formal inquiry into the defendant's competence; when faced with evidence of relatively minor changes in the defendant's mental state, the court may rely on a prior competency finding rather than convening a new hearing to cover largely the same ground." (*Id.* at pp. 234–235.) However, "[i]f in the course of [criminal] proceedings the trial court learns of new facts and circumstances inconsistent with the predicate assumptions, it has a duty to declare a doubt regarding the defendant's current competence and conduct a hearing on the subject." (*People v. Tejeda* (2019) 40 Cal.App.5th 785, 792.)

The same principles apply to pro. per. defendants, but rather than focus on the defendant's ability to assist his lawyer, the focus is on the defendant's ability to conduct his own defense in a rational manner. (See, e.g., *In re Sims* (2018) 27 Cal.App.5th 195, 208 ["Where the defendant is representing himself or herself, the standard of competence is the same"]; *People v. Murdoch* (2011) 194 Cal.App.4th 230, 239 ["A defendant is competent to stand trial if 'he is able to understand the nature and purpose of

the proceedings taken against him *and to conduct his own defense in a rational manner*"].)

A reviewing court "appl[ies] a deferential standard of review to a trial court's ruling concerning whether another competency hearing must be held." (*People v. Huggins* (2006) 38 Cal.4th 175, 220.) The court reviews the trial court's finding of no substantial change of circumstances or no new evidence casting doubt on the validity of the initial competency determination for substantial evidence. (*Ibid*.)

II.

THE TRIAL COURT PROPERLY DENIED THE REQUEST FOR A SECOND
COMPETENCY HEARING

Here, over the public defender's objections, the trial court previously declared a doubt as to Martin's ability to represent himself. The doubt was based, in part, on the fact that Martin would not be presenting any witnesses which, at that time, the court deemed as "legal suicide." After evaluations by two doctors and without objection from the public defender or the prosecutor, it was determined that Martin was competent to stand trial and to represent himself. Thus, Martin must present new evidence or a substantial change in circumstances casting doubt on that prior finding before the court is required to declare a doubt and suspend proceedings a second time.

Martin contends that new evidence compelled the trial court to declare a doubt and suspend proceedings. The new evidence consists of the following: (1) the public defender's declaration of doubt; (2) Martin's singular outburst where he referenced the FBI, President Trump, shark gizmos and solar panels; (3) Martin's lack of presenting an affirmative defense case, including not giving an opening statement and not cross-examining

16

witnesses, and curious strategic decisions such as electing to wear jail clothing; and (4) his suicide attempt. We address these factual circumstances in order.

The first two facts relating to the public defender's declaration of doubt and the singular outburst are insufficient to raise a doubt as to Martin's competency. As the California Supreme Court has stated, "'[M]ore is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] . . . ." (*Ghobrial*, *supra*, 5 Cal.5th at p. 270.) Additionally, the trial court found the singular outburst was deliberate and premeditated, a finding supported by a reasonable interpretation of Martin's statement that he was planting a seed. Thus, the singular outburst actually supports an inference Martin was competent to stand trial and represent himself because he implemented a strategic goal of influencing the jury.

The third factor concerns Martin's failure to implement a strategy he previously disclosed, i.e., persuading the jury the forensic and circumstantial evidence would show he was not the driver. However, his passive defense strategy was evident before the public defender's request to suspend proceedings a second time. Indeed, it was his stated decision not to call any witnesses that factored in the trial court's decision to suspend proceedings the first time. As the high court stated, "[T]he duty to suspend is not triggered by information that substantially duplicates evidence already considered at an earlier, formal inquiry into the defendant's competence." (*Rodas*, *supra*, 6 Cal.5th at p. 234; cf. *People v. Lawley* (2002) 27 Cal.4th 102, 136–137 [no error in failing to conduct a second competency hearing where

17

proffered evidence affirmed "the same arguably delusional beliefs reported" by experts in their previous competency evaluations].)

Martin's trial conduct also does not support a finding that his mental state deteriorated over time. Based on the trial court's observations, except for the singular outburst which it found was deliberate and premeditated, Martin's demeanor before and during trial was professional and deferential. (See *Jones*, *supra*, 53 Cal.3d at p. 1153 ["[T]he trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state."].) The court also confirmed with Martin that his election to wear jail clothing was what he felt was the best course of action, and that his failure to present opening argument and to cross-examine witnesses was a conscious choice. Our review of the few comments Martin did make reflect his communications were appropriate in context and language. The case thus is distinguishable from *People v. Easter* (2019) 34 Cal.App.5th 226, where the defendant's communications deteriorated over time. (See *id.* at p. 243 [noting "defendant's recent communications consist[ing] of jumbled words and fanciful responses . . . was different than anything described by [two experts] and was not presented to the jury in [the prior competency hearing]"].) In sum, Martin's trial conduct did not support suspension of proceedings a second time.

Finally, Martin's suicide attempt, by itself, does not support a second suspension of proceedings. As the California Supreme Court has stated: "Actual suicide attempts or suicidal ideation, in combination with other factors, may constitute substantial evidence raising a bona fide doubt regarding a defendant's competence to stand trial." (*People v. Rogers* (2006) 39 Cal.4th 826, 848.) However, here, the suicide attempt was not

"accompanied by bizarre behavior, the testimony of a mental health professional regarding competency, or any other indications of an inability to understand the proceedings . . . ." (*Ibid.*) Specifically, as discussed, the only bizarre behavior was the singular outburst, which the trial court determined was a deliberate and premeditated act. After the suicide attempt, mental health experts concluded four times Martin did not present a major mental illness or disorder. Finally, Martin's trial conduct did not demonstrate he was incompetent.

In conclusion, our review of the evidence shows the trial court conscientiously fulfilled its duties to ensure Martin was competent both to stand trial and to represent himself. Although Martin's passive trial strategy was unwise, there is no substantial evidence that a mental illness or disorder rendered him incompetent to represent himself. Under our legal system, a criminal defendant need not put on an affirmative case because the burden of proof is on the prosecution. (See *Serrano v. Superior Court* (2017) 16 Cal.App.5th 759, 776 [a defendant "is not required to testify at trial, or *even to put on a defense*, and has the right to defend himself simply by testing the prosecution's case" (italics added)].) Finally, although we consider only the facts before the trial court when it made its decision, we note that Martin's subsequent conduct does not cast doubt on the court's competency finding. His words and actions remained consistent throughout the trial, indicating there was no deterioration of his mental state. At sentencing, he requested appointed counsel, indicating he understood and appreciated the importance of attorney assistance. The trial court did not err in denying the request to suspend proceedings a second time.

Our conclusion that the trial court did not err in refusing to suspend criminal proceedings also disposes of Martin's related due process

claim. (See, e.g., *Ary*, *supra*, 51 Cal.4th at p. 517 ["When a trial court is presented with evidence that raises a reasonable doubt about a defendant's mental competence to stand trial, federal due process principles require that trial proceedings be suspended and a hearing be held to determine the defendant's competence"].) As discussed, no substantial evidence casted doubt on the prior competency finding. Accordingly, Martin was not denied his due process right to a second competency hearing.

DISPOSITION

The judgment is affirmed.

DELANEY, J.

WE CONCUR:

O'LEARY, P. J.

MOORE, J.